Wachtler, J.
We have before us once again the problem presented by what are commonly called the Sunday Blue Laws. And while the notion of a quiet Sunday is unquestion *280 ably valid in principle, we believe that two of the sections challenged here are constitutionally defective. We refer specifically to the sections dealing with the prohibition against public sales and the forfeiture provision of the statute (General Business Law, §§ 9, 12).[1] Due to the gallimaufry of exceptions which has obliterated any natural nexus between section 9 and the salutory purpose of the Sabbath Laws and the pervasive ambiguity of section 12 we declare both of these sections unconstitutional.
There is no dispute as to the facts. Louis Fratto, an employee in a local pharmacy, was charged with Sabbath breaking by virtue of selling a ceramic bank, merchandise not specifically exempted from the general closing mandate of the Blue Laws (General Business Law, § 9).[2] The trial court dismissed the information on the grounds that the forfeiture and enforcement provisions of the statute were unenforceable by reason of vagueness, ambiguity and inconsistency (General Business Law, §§ 4, 12). A divided Appellate Term reversed on the law and reinstated the information. The dissenter found the statute an unconstitutional anachronism the purpose of which has been completely frustrated by the proliferation of arbitrary and haphazard exceptions.
On appeal to our court, both sides raise the classic arguments. The appellant contends that the crazyquilt exceptions to the general closing directive render section 9 of the statute unconstitutional due to the absence of a rational basis to accomplish the avowed purpose of the law. The State responds by raising the presumption of constitutionality and though conceding the imperfections of section 9, argues that the Legislature should be afforded a wide degree of latitude in delineating those activities which are permissible.
Before proceeding to a discussion of the merits it should be noted that the present Sabbath Laws (General Business Law, art 2) are the product of centuries of evolutionary mutation. Thus, a cursory review of their history would be appropriate in order to set our holding, as well as the interrelationship among the various provisions, in perspective.
*281 There is little doubt that these laws are clearly religious in origin being derived from the concise directive of the Old Testament that on the seventh day no work shall be done (Exodus, XXXI, 14-15). As a precept of civil government, however, the Sunday Laws are over 16 centuries old having been originated by the Roman Emperor Constantine in 321 AD who ordered all Judges and inhabitants of cities to rest on Sunday. Similar legislation appears in the laws of the Holy Roman Empire and in Saxon laws (28 A&E Encyc 390). Although the English common law contained no general ban on Sunday activity aside from the prohibition against judicial proceedings, more expansive Sunday Laws were passed at an early date (29 Chas II, ch 7) and became the basis for similar legislation in this Country. The first Sabbath Laws in America were enacted in Virginia in 1614, some three years before the Pilgrims landed at Plymouth Rock (10 Va L Reg 64; 28 A &E Encyc 390). Most of the colonies, including New York, followed suit. The earliest law in force in this State implying an obligation to observe the Sabbath was promulgated by the Dutch Burgomasters of Amsterdam in 1656 (see People v Hoym, 20 How Prac 76) and was superseded by the Duke of York’s laws when the Dutch relinquished control to the English in 1664.
The genesis of our present statute appears to have been the act of October 22, 1695 "an Act against profanation of the Lord’s Day, called Sunday” which contains many provisions similar to those appearing in previous versions of the statute presently under consideration (Laws of the Colony of New York, 1695, ch 52). This act remained in effect during the Revolutionary War and was retained by the Constitution of 1777. It remained in force until 1788 when the first State Sabbath Law was enacted (Laws of New York, 1785-1788, ch 42). This law, entitled "An Act for suppressing immorality”, cast the acts prohibited into four general categories: (1) travel, (2) labor or work, (3) sports and amusements, (4) business or occupation. Specifically the statute provided that on the first day of the week commonly called Sunday "there shall be no travelling, servile labouring, or working, (works of necessity and charity excepted) shooting * * * hunting or frequenting of tipling houses * * * and that no person shall cry, shew forth or expose to sale, any wares, merchandize, fruit, herbs, goods or chattels * * * except small meat and milk, and fish, before nine of the o’clock in the morning”. This basic scheme which *282 is still apparent has been retained and expanded over the years.
The first revision occurred in 1813 and, while it effected no change, is significant for the notes compiled in the margin. These notes list the source material for the various provisions and clearly indicate that the prohibition against laboring has roots separate and distinct from the prohibition against public selling (L 1813, ch 24, margin notes; compare General Business Law, § 8, with § 9). Another indication of the dichotomy between these two categories is the applicability of an exception for "necessity and charity” with respect to the ban on Sunday labor and the absence of a similar exception for the public traffic provision (see, also, 37 Cycl, Sunday, III, C, 2). The historical distinction between these two concepts is important when ascribing meanings to similar provisions in successor statutes.
Although there were subsequent revisions effecting minor changes throughout the nineteenth century, New York’s original Sabbath Law remained virtually unaltered until 1881. At that time the statute received a completely new format (which it still retains) and the previous sections which were embodied in the Penal Code[3] were repealed (L 1881, Penal Code, tit X, § 259 et seq.). Under this revised scheme* * the main categories of Sabbath breaking were divided into separate sections, with two important changes. First, the ban on Sunday traveling was eliminated entirely. Second, the prohibition against servile labor was refined by the inclusion of a separate exception for trades, manufactures and mechanical employments (Penal Code of 1881, § 266). That the new section banning trades, *283 manufacturing and mechanical employments on Sundays was actually a parsing of the category prohibiting servile labor is apparent by the subsequent amendment excepting works of necessity provided they did not interfere with the repose of the community (L 1883, ch 358, § 3, amdg § 266 of the Penal Code of 1881). As previously noted this saving provision was only applicable to the labor prohibition and not the public traffic prohibition.
It is also interesting to note that with the 1881 revision the number of exceptions to the mandate against public selling more than doubled. Throughout the previous century the only commodities allowed to be sold were meats, milk and fish provided they were sold before 9:00 a.m. However, in addition to these foods the revised statute permitted, at any time of the day, the sale of food to be eaten on the premises where sold, drugs, medicines and surgical appliances (Penal Code of 1881, § 267). This marked the beginning of the proliferation of exceptions to the public selling prohibition which has since overwhelmed the statute.
After the turn of the century the Sabbath Laws were recodifed in a new penal law (L 1909, Penal Law, art 192, § 2140 et seq.). Those sections coming under the general heading of laboring or working were essentially unchanged. (Compare Penal Code of 1881, §§ 263, 266, with Penal Law of 1909, §§ 2143, 2146, respectively.) The provision dealing with public sports was relaxed considerably to reflect the change in the society. (Compare Penal Code of 1881, § 265, with Penal Law of 1909, § 2145.) Notably the section pertaining to public traffic was subjected to the further multiplication of exceptions. (Compare Penal Code of 1881, § 267, with Penal Law of 1909, § 2147.)
Aside from the public sports section which has been broadened substantially but is no longer relevant to our discussion, the remaining provisions present an interesting contrast. While the prohibitions dealing with laboring (presently General Business Law, §§ 5, 8) have experienced minimal change in the last century, the public traffic section (presently General Business Law, § 9) has been riddled with alterations.[4] This *284 process of engrafting exceptions to the ban against Sunday selling gathered momentum and by 1967, when the statute was removed from the Penal Law and re-enacted as part of the General Business Law, the three original exceptions had swollen to several dozen and generated a corresponding increase in litigation. And certainly the recent amendments do not indicate that the stream of exceptions has abated. (See, e.g., L 1975, ch 759, § 1, permitting the public auction of thoroughbred, standardbred and quarter horse racehorses; L 1973, ch 995, § 1, permitting the sale of items of art and antiques.) The appellant’s challenge to this section therefore is based on the resultant inconsistency, confusion and lack of perceptible scheme generated by this gallimaufrous section.
Our analysis of section 9 (General Business Law, § 9) leads to the inescapable conclusion that it no longer possesses the requisite rationality in light of its avowed purpose. When entering a particular field, the Legislature invariably incorporates its value judgments into the definitions and categories of the statutory scheme. The performance of this task necessarily involves the drawing of arbitrary lines. Therefore when the Legislature decides to regulate the production of one commodity and not another it has made a choice which is arbitrary. That alone will not render the legislation defective since there may be arbitrary distinctions as part of a rational pattern. A general illustration of this concept is that in many countries vehicles must travel on the right side of the road. Although arbitrary this is nevertheless compelling and therefore rational in that one side or the other be chosen. Thus, while arbitrariness in the sense of selection within a group of choices is inevitable, a modicum of rationality is required for a statute to be valid (McGowan v Maryland, 366 US 420, 425-426).
Of course, one must be wary that assertions of irrationality are not simply reflections in the eye of the beholder. To provide a day of rest it is necessary in modern society both to permit and to prohibit. In the selection of what should be permitted, accommodation is made to serve modern relaxed ideas of what is desirable or even necessary to a uniform day of rest. No two persons or groups by reason of diverse tastes (or needs) are likely to agree on the commercial activity which *285 should be permitted, or prohibited. Respect for legislative wisdom and prerogatives as well as a proper sense of judicial power compels deference to enactments which are rationally related to the intended purpose. Consequently unconstitutionality on the grounds of irrationality is the weakest ground for striking down a statute and is seldom used. Yet where a statute encompasses a haphazard and anachronistic amalgamation of exceptions lacking discernible connection to the law’s purpose, it cannot be judicially condoned. There is no question but that the Legislature could find that the sale of certain commodities or the rendering of certain services on Sunday are both necessary and desirable. Indeed the world cannot cease to function on Sunday and so exceptions must be found which reasonably relate to the health of the citizenry as well as the enhancement of their rest and relaxation. Even if these exceptions result in what appears to be a form of statutory discrimination that is arbitrary, the statute should not be judicially disturbed if found to be justified and related to the legislative objective (McGowan v Maryland, supra; see Kotch v Pilot Comrs., 330 US 552). However, legislative leeway should never be permitted to extend to the promulgating of statutes which are utterly lacking in - cohesive scheme. When the classifications are not only arbitrary but also irrational they transgress the broad prerogatives of the Legislature.
The challenged section (General Business Law, § 9) contains a polyglot of exceptions to the general closing mandate which is essentially devoid of rhyme or reason. And although we are tempted to illustrate its absurdities by portraying the bountiful colors of this crazyquilt, they are well documented and reiteration would serve no useful purpose (see, e.g., People v Acme Markets, 37 NY2d 326, 332 [concurring opn Wachtler, J.]; Playtogs Factory Outlet v County of Orange, 51 AD2d 772 [concurring opn Shapiro, J.]). Suffice' it to say that although mathematical symmetry is not required, the helter-skelter collection of exceptions found in this section ranging from thoroughbreds to soda water, renders it unenforceable and consequently popularly flouted. A concomitant effect of this unenforceability is an erosive disrespect for the law which should not be tolerated in the name of legislative latitude. Moreover, the irrationality of section 9 is confirmed by the conspicuous evidence of prosecutorial indifference, of popular *286 disdain for the prohibitions of the statute and of community inappetence for its enforcement.
In our view the only solution is to declare unconstitutional section 9 of the General Business Law as it is presently drafted. To declare just the offending exceptions void would be unwise since the general closing mandate would still remain. Equally unwise would be for the court to engage in the legislative function of selecting those exceptions which are rationally related to the statute’s purpose.
The most appropriate course is to invalidate the entire section[5] and present the Legislature with a clean slate. Should the Legislature continue to deem a Sunday closing law desirable it may readily devise a system of exemptions which could produce an atmosphere appropriate for a common day of rest and one which is consonant with today’s needs and mores. Hopefully new legislation could provide sufficient leeway to allow the social dynamics of supply and demand as well as the stabilizing effects of custom and tradition to gravitate toward a scheme which is acceptable to the people and enforceable.
Finally, we have also considered the validity of the forfeiture provision of the Blue Laws (General Business Law, § 12) and have determined that it is unconstitutionally vague. Again an historical perspective is instructive. The first Sabbath Laws enacted by New York State provided for a fine of six shillings for each offense and a forfeiture of any goods to be sold in satisfaction of the penalty. The proceeds were to be turned over to the "overseers of the poor” for the use of the poor. In the event that the offender had no goods or the proceeds of a forfeiture sale were shy the offender was to "be set publickly in the stocks” for two hours (Laws of New York, 1785-1788, ch 42). Subsequent enactments modified the sanctions by providing for an outright forfeiture of goods exposed for sale and by ameliorating the alternate penalty by imposing a stint in "the common gaol” for no more than 12 hours (L *287 1813, ch 24). The precursor to our present statute made Sabbath breaking punishable by a fine of up to $10 and if the public selling section was violated a forfeiture of all the goods exposed for sale with the proceeds paid to the "overseers of the poor” (Penal Code of 1881, §§ 269, 270). These penalties were continued unchanged in the Penal Law of 1909 (§§ 2149, 2152) but modified somewhat in the present statute. Nevertheless those parties violating the public traffic provision of the Sabbath Laws are not only fined from $5 to $10 (General Business Law, § 4) but forfeit all the property exposed for sale with the proceeds paid to the "overseers of the poor” (§ 12). As noted by the trial court this forfeiture section is rife with ambiguities. We know of no municipality which has "overseers of the poor”. Moreover the statute fails to specify who the recipients would be or how they would be selected. This provision is a classic example of an eighteenth century statute which has never been modernized and is unable to function in a twentieth century world. This obsolete provision, in dire need of renovation, should be declared unconstitutionally vague.
Accordingly, the order appealed from should be reversed and sections 9 and 12 of the General Business Law declared unconstitutional and void.

Appendix

§ 9. Public traffic on Sunday.
All manner of public selling or offering for sale of any property upon Sunday is prohibited, except as follows: 1. Articles of food may be sold, served, supplied and delivered at any time before ten o’clock in the morning:
2. Meals may be sold to be eaten on the premises where sold at any time of the day;
3. Caterers may serve meals to their patrons at any time of the day;
4. Prepared tobacco, bread, milk, eggs, ice, soda-water, fruit, flowers, confectinery, souvenirs, items of art and antiques, newspapers, magazines, gasoline, oil, tires, cemetery monuments, drugs, medicine and surgical instruments may be sold and delivered at any time of the day.
5. Grocers, delicatessen dealers and bakeries may sell, supply, serve and deliver cooked and prepared foods, between the hours of four o’clock in the afternoon and half-past seven o’clock in the evening, in addition to the time provided for in subdivision one hereof, and, elsewhere than in cities and villages having a population of forty thousand or more, delicatessen dealers, bakeries and farmers’ markets or roadside stands selling fresh vegetables and other farm produce, and fishing tackle and bait stores may sell, supply, serve and deliver merchandise usually sold by them, at any time of the day.
*288 6. Persons, firms or corporations holding licenses and/or permits issued under the provisions of the alcoholic beverage control law permitting the sale of beer at retail, may sell such beverages at retail on Sunday before three antemeridian and after twelve noon for off-premises consumption to persons making purchases at the licensed premises to be taken by them from the licensed premises.
7. Sale at public auction of thoroughbred, standardbred and quarter horse racehorses.
The provisions of this section, however, shall not be construed to allow or permit the public sale or exposing for sale or delivery of uncooked flesh foods or meats, fresh or salt, at any hour of the time of the day. Delicatessen dealers shall not be considered as caterers within subdivision three hereof.
§ 12. Forfeiture of commodities exposed for sale on Sunday.
In addition to the penalty imposed by section four, all property and commodities exposed for sale on the first day of the week in violation of the provisions of this article shall be forfeited. Upon conviction of the offender by a justice of the peace of a county, or by any police justice or magistrate, such officer shall issue a warrant for the seizure, of the forfeited articles, which, when seized, shall be sold on one day’s notice, and the proceeds paid to the overseers of the poor, for the use of the poor of the town or city.

. For the text of sections 9 and 12 of the General Business Law, see Appendix attached.

. In view of the apparently random and hence nondiscriminatory manner of enforcement here, the appellant does not assert unconstitutional discriminatory enforcement as a basis for reversal. (But cf. People v Acme Markets, 37 NY2d 326).

. The statute read in pertinent part as follows:
"§ 263. All manner of servile labor, on the first day of the week, is prohibited, excepting in works of necessity or charity.
* * *
"§ 265. All shooting, hunting, fishing, playing, horse racing, gaming or other public sports, exercises, pastimes or shows, upon the first day of the week, and all noise disturbing the peace of the day, are prohibited.
"§ 266. All trades, manufactures and mechanical employments upon the first day of the week are prohibited.
"§ 267. All manner of public selling, or offering or exposing for sale publicly, of any commodities upon the first day of the week is prohibited, except that meats, milk and fish may be sold at any time before nine o’clock in the morning, and except that food may be sold to be eaten upon the premises where sold, and drugs, medicines and surgical applicances [sic]may be sold, at any time of the day.”
In 1883 the word servile was deleted from section 263 (L 1883, ch 358, § 1).

. No doubt the spasmodic promulgation of exceptions enacted over nearly a century represents diverse and occasionally contradictory legislative response to societal input. Nevertheless it is beyond the province of the judiciary to hypothesize about the motives of legislators and whether or not portions of a statute are attributable to the efforts of so-called special interests (Soon Hing v Crowley, 113 US *284 703). The task of a reviewing court is to evaluate the assailed statutes in light of settled principles, not subjective predilections.

. We are not unmindful that a consequence of eliminating the general closing mandate will be the opening of numerous business establishments on Sundays which will require the performance of various services that could be classified as labor. Our decision today in no way infringes on the prohibition against labor (General Business Law, § 5); however, we would note that this section contains an exception for labor which is necessary for the "good order, health or comfort of the community” (§ 5). Moreover, we believe that our holding need not work a hardship on those who are required to work on Sundays in light of the protections afforded by the Labor Law (e.g., Labor Law, § 161) and the potential for either statutory or contractual adjustments in the rate of compensation.