STATE OF CONNECTICUT *v.* ANONYMOUS (1976–12)*

COURT OF COMMON PLEAS

ROTTMAN, J. This motion to dismiss was filed following an arrest for an alleged violation of Public Acts 1976, No. 76-415, as amended by §§ 79 and 81 of Public Acts 1976, No. 76-435, collectively known as the "Sunday Blue Laws." Only those principles of the motion which challenge the constitutionality of those laws will be considered herein. The state and defense counsel have agreed, with the approval of the court, that the remaining issues, which would require a substantial evidentiary hearing, may be heard at a later date if necessary.

Earlier this year, the Court of Common Pleas, in ruling on a motion to dismiss virtually identical to that filed in the present case, held that the then applicable Blue Laws, § 53-300 of the General Statutes, "are so vague and ambiguous as to leave any reasonable law-abiding citizen in a complete quandary as to what is prohibited by these laws, and that these laws are therefore completely unconstitutional." *State* v. *Anonymous (1976–7)*, 33 Conn. Sup. 55, 66.

The 1976 sessions of the Connecticut General Assembly amended § 53-300 by Public Acts 1976, No. 76-415 and Public Acts 1976, No. 76-435, §§ 79 and 81. The defendant in the present case was

---

* Thus entitled, in view of General Statutes § 54-90.

arrested for an alleged violation of those acts. Since this court concurs with the holdings of the court in *State* v. *Anonymous (1976–7)*, supra, the issue to be decided herein is whether the amendments remedied the defects in the previous Blue Laws which rendered them unconstitutional.

The common origin of Public Acts 1976, No. 76-415, and its predecessor, § 53-300 of the General Statutes, is found among the very earliest enactments of the General Court of the Connecticut colony. The history and purpose of that legislation was discussed by the Supreme Court of this state in the case of *State* v. *Miller,* 68 Conn. 373. That discussion need not be repeated here.

Consistent with its original purpose, which was to secure the fitting observance of Sunday as a day for religious worship, the statute contains a general prohibition against the performance of any secular business or labor on Sunday. From that basic prohibition, the statute sets forth a list of exceptions, specifying a classification of goods which may be sold and a classification of activities which may be engaged in without violation of the law.

To borrow a description used by Judge Wachtler of the New York Court of Appeals in describing the remarkably similar New York statute, this "gallimaufry" of exceptions can best be described as a polyglot of special interest legislation which has obliterated any natural nexus between the present statute and the salutary purpose of the Sabbath laws. *People* v. *Abrahams,* 40 N.Y.2d 277. Although some of the exceptions contained in the previous statute were incorporated into more general exceptions in the new law, a superficial reading and comparison of the two statutes clearly demonstrate that the legislature made little or no change in the basic

thrust of those special interest exceptions. Indeed, as the court is aware, the legislature attempted, albeit unsuccessfully, to create new and more onerous distinctions.

The 1976 General Assembly's attempt to recast the former statute cannot disguise the fact that the vast majority of the exceptions have evolved through a series of special interest amendments. For example: In attempting to aid "Mom and Pop" stores of less than 5000 square feet at the expense of the larger stores, the legislature created the well publicized "loophole" in the new statute which allows Sunday operations by large retail grocery stores. Recognizing, perhaps, the decentralization of population and the rise of automobile conscious suburbia, the legislature amended the predecessor statute in 1953 to allow the sale of gasoline. Recognizing the modern retailing practices of the gasoline industry, the legislature, in the 1976 statute, finally has acknowledged that gasoline is not the only product necessary for operation of motor vehicles, and it has allowed the sale of "fuel additives, lubricants, anti-freeze and tires." Public Acts 1976, No. 76-415, § 1 (d) (7). Again recognizing the admitted need for a freshly laundered society, the legislature in the 1976 statute, § 1 (e) (19), has incorporated a 1961 amendment to the previous statute to specify that public use of coin-operated laundries and coin-operated dry cleaners is not in violation of the Blue Laws. Continuing an amendment added to the former statute in 1969, presumably at the behest of a well organized dog lobby, the legislature in the present statute, § 1 (e) (20), has allowed the operation of licensed commercial kennels and pet shops. Finally, discovering what would have been a tragic omission from the statute, the 1976 legislature has added the operation of "commercial facilities for the

washing of motor vehicles, motorcycles, boats or aircraft," § 1 (e) (23), to the list of permissible activities in the technical amendment to the statute. Public Acts 1976, No. 76-435, § 79.

The above indicates the nature and manner in which the special interest exceptions have been predictably grafted onto the statute.

While the legislature in its legitimate exercise of the police power is free to create a scheme of classification which may subject individuals to different treatment under the law, that classification can only withstand constitutional scrutiny if two distinct requirements are met. First, the motivation for the legislation must arise from a permissible state purpose. Second, the distinctions drawn by the legislature in the formulation of its scheme of classification must be rationally related to the accomplishment of the expressed state purpose. *Reed* v. *Reed,* 404 U.S. 71; *McDonald* v. *Board of Election Commissioners,* 394 U.S. 802; *Langs* v. *Harder,* 165 Conn. 490, 504; and *In re Application of Griffiths,* 162 Conn. 249, rev'd 413 U.S. 717.

If it is assumed that the legislative purpose in enacting Public Acts 1976, No. 76-415, was to secure the observance of Sunday as a day of rest and recreation, it remains to be determined whether that legislation, in its present form, bears any rational relationship to the accomplishment of that purpose. A facial analysis of the classifications contained in the act reveals no rational basis for prohibiting on Sunday the sale of certain items or the performance of certain activities, while at the same time allowing, through exceptions, the sale of other items or the performance of other activities which fall within the same general class.

A reading of the statute demonstrates that it contains no general regulatory scheme. Its byzantine

series of special interest exceptions has completely displaced whatever original pattern or rationality may have been contemplated by its drafters in either the seventeenth or twentieth century. What remains is a system so arbitrary in classification and so out of touch with modern life that it is not possible to decipher any legitimate legislative scheme in its continuance.

It takes little analysis to see that this maze of statutory exceptions has created so many obvious contradictions that the statute is irrational on its face and that it no longer bears any meaningful relationship to the accepted practices of a mobile society which is oriented towards recreation and convenience. Magazines such as *Playboy* or *Penthouse* may be sold on Sunday, but the sale of classic literature, if contained in the form of a book, would constitute a violation of the statute. A shocking anomaly recognized by the courts of other states which have similar statutes is that the sale of the Bible itself would be a violation of the Sunday closing law as presently written. Further demonstrating the complete irrationality of the present statute is the fact that, although books themselves may not be sold, the business of publishing and distributing books is lawful. Public Acts 1976, No. 76-415, § 1 (e) (13). While the use of coin-operated laundries or coin-operated dry cleaners is not prohibited, neither the soap and related products necessary for their operation, nor the clothing itself, may be purchased on Sunday. Tobacco products, which have been recognized by the medical community and by the federal government as extremely hazardous to an individual's health, may be legally purchased on Sunday; but essential items such as clothing and footwear, unless they are somehow related to exempted sports activities, may not be legally purchased. While items designated as

emergency and repair parts for motor vehicles, plumbing, heating, cooling, and electrical systems may be sold, normal hardware items necessary for the use and installation of those parts may not be sold. One may buy a washer to repair a leaking faucet, if it is assumed that a leaking faucet is in fact an "emergency," but he may not purchase the wrench and screwdriver essential to complete the repair. Since it is presumably based on the statute's purpose of promoting rest and recreation, the sale of "artists' supplies" is permitted. Yet why is the sale of artists' supplies for the purpose of recreation any different from the sale of other similar items, such as music supplies and hobby supplies, which under the present statute may not be sold? Does that distinction further the rational purpose of this statute? "Films" may be sold under the statute. Yet items necessary for the use of film, such as cameras, batteries, and flashbulbs, may not be sold, nor may exposed film be accepted for processing. Within the legislature's goal of family recreation one may buy the necessary food and accoutrements for a picnic, but he may not buy the paper plates, cups and plastic silverware necessary to complete the outing.

The above examples are by no means exhaustive. Careful analysis of the dichotomy between permitted and prohibited items under the statute reveals an endless series of similar contradictions. More difficult to understand, however, are the attempted distinctions between permitted and prohibited business activities. Although attempting to accomplish exactly the opposite, the legislature has drawn a distinction between small convenience stores and retail grocery stores. Pursuant to Public Acts 1976, No. 76-415, § 1 (d), as amended by § 79 of Public Acts 1976, No. 76-435, large grocery stores may sell substantially all of the items

in their inventory since that merchandise falls within the twelve exceptions of that subsection and is sold in the ordinary course of business. In contrast, the clear language of § 1 (e) (1) (A) provides that retail food stores in which no more than five persons are employed at one time and which have less than 5000 square feet are limited to the sale of "food products and nonalcoholic beverages intended for human or animal consumption." The remaining eleven categories of items delineated in subsection (d), which can be and are sold by larger retail stores, cannot legally be sold in stores having less than 5000 square feet. The inherent conflict between subsections (d) and (e), which the legislature has openly admitted to have been an error, cannot be overcome by liberal interpretation. The prefatory language of subsection (e) unequivocally states that those businesses enumerated within that subsection may sell items sold in the ordinary course of business *"unless otherwise provided in this subsection."* (Emphasis added.) By clear language, albeit mistaken, the legislature has resolved the conflict between subsections (d) and (e) and has left no doubt that the latter is to control. Equally difficult to justify is the distinction which the legislature attempts to draw between identical articles of clothing, footwear, and equipment which may be sold in "athletic shops associated with and on the premises of athletic facilities which operate on Sundays" but which may not be sold in normal retail and, particularly, discount stores. There can be no rational reason to differentiate between items sold by those shops associated with athletic facilities, which often sell articles only tangentially related to actual participation, and items sold in independent retail and discount stores. Quite apart from the unconstitutional discrimination inherent in that type of distinction, it forces the public to pay the exorbitant prices charged by those shops

when identical merchandise is available from independent retail stores.

The court holds that an analysis of the language of the present statute reveals that the legislature has made no significant change in the system of classification and the polyglot of exceptions contained in the former Sunday closing laws of this state. Indeed, the legislature's unsuccessful and admittedly aborted attempt to infuse some degree of rationality into that statute has completely failed.

A generally accepted test for determining whether a statute fulfills the constitutional requirement of definiteness is whether the enactment gives fair notice to a person of ordinary intelligence that his contemplated conduct is forbidden by the law. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed. "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Construction Co.,* 269 U.S. 385, 391.

The evils inherent in an unconstitutionally vague criminal statute were more recently discussed by Mr. Justice Marshall in *Grayned* v. *Rockford,* 408 U.S.-104, 108–109: "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we

assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."

This court holds that, based on a review of the statute on its face, Public Acts 1976, No. 76-415, fails to meet the minimal requirements of due process in regard to vagueness and is subject to both classes of evil discussed by Mr. Justice Marshall in *Grayned,* supra. When, as in the case before this court, a penal statute is demonstrated to be the subject of widely disparate and subjective interpretation, it must fall to the fundamental requirements of "fair play and substantial justice" guaranteed by both the fourteenth amendment to the constitution of the United States and by article first, § 8, of the constitution of Connecticut.

For all of the foregoing reasons, this court holds that Public Acts 1976, No. 76-415, as amended by Public Acts 1976, No. 76-435, §§ 79 and 81, is unconstitutional.

The motion to dismiss is granted, the other issues listed in the defendant's motion are, therefore, moot, and the charges against the defendant are dismissed.