THE CITY OF CARBONDALE *ex rel.* JOHN HAM, Plaintiff-Appellant, *v.* NEAL ECKERT *et al.*, Defendants-Appellees.—THE CITY OF CARBONDALE *ex rel.* KENNETH MARQUARD, Plaintiff-Appellant, *v.* NEAL ECKERT *et al.*, Defendants-Appellees.—THE CITY OF CARBONDALE *ex rel.* JAMES B. HEWETTE, Plaintiff-Appellant, *v.* NEAL ECKERT *et al.*, Defendants-Appellees.

Fifth District    Nos. 78-428, 78-552, 78-536 cons.

Opinion filed August 31, 1979.—Rehearing denied September 27, 1979.

William L. Broom, III, of Barrett, Morris & Broom, of Carbondale, for appellant.

John Womick, of Carbondale, for appellees.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Pursuant to its home-rule powers, the city of Carbondale (city) passed an ordinance on August 7, 1978, authorizing the city council to sell certain parcels of urban renewal property for redevelopment in accordance with the city's urban renewal plan. At the same meeting, two ordinances were passed authorizing the sale of separate sections of the property to UMIC Securities Corporation and the First National Bank and Trust Company of Carbondale, as trustee, both of whom are defendants in the actions considered herein. The sales were quickly consummated and their validity was subsequently challenged in the circuit court of Jackson County in three individual taxpayer suits under section 1—5—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 1—5—1). These suits were brought by John Ham, Kenneth Marquard and James Hewette in the name and for the benefit of the city. In Ham and Marquard's suits, the trial court entered orders granting motions for summary judgment based on plaintiff's lack of standing. In Hewette's suit, the trial court dismissed the action with prejudice pursuant to defense motions based on the merits of the case as well as the issue of standing. The plaintiffs appealed these judgments, and this court consolidated all three cases on appeal.

The primary contention of the plaintiffs is that the property in question is subject to the scheme of disposition contained in section 6 of the Urban Community Conservation Act (Ill. Rev. Stat. 1977, ch. 67½, par. 91.13) and that the sales of these parcels were void since they were made contrary to the provision of that section that property held over five years must be sold to the highest bidder at a public sale.

The General Assembly has from time to time enacted various statutes directed towards meeting the urban renewal problems of Illinois municipalities. In 1953, the legislature enacted the Urban Community Conservation Act (Ill. Rev. Stat. 1953, ch. 67½, par. 91.8 *et seq.*), the purpose of which was to grant sufficient powers to municipalities to upgrade certain predominantly residential areas and prevent their deterioration into slums and blighted areas. (Ill. Rev. Stat. 1953, ch. 67½, par. 91.9 and 91.10(d).) The Act contemplated that these powers would be exercised by the municipality through a conservation board. By statute any board created under the Act had the power, among others, to designate areas meeting the Act's requirements for a "conservation area," to approve all conservation plans developed for these areas, to approve the use of eminent domain for the acquisition of real property for the purposes of the Act and to act as the agent of the municipality in the acquisition, management and disposition of property acquired pursuant to the Act. Ill. Rev. Stat. 1953, ch. 67½, par. 91.11(a)-(c).

In May of 1962, the city adopted Ordinance No. 1168, creating a conservation board to act pursuant to the provisions of the Urban Community Conservation Act. The ordinance expressly adopted the substance of sections 3 through 6 of the Act (Ill. Rev. Stat. 1961, ch. 67½, pars. 91.10-91.13), including the proviso of section 6 that "[n]o property shall be held more than 5 years, after which period such property shall be sold to the highest bidder at public sale." By resolution in June of 1968, the city designated a particular area as a conservation area. That conservation area, referred to as the College Neighborhood Urban Renewal Area, contained all of the property that was sold in 1978 which serves as the subject of the present taxpayer suits. A conservation plan for the College Neighborhood Urban Renewal Area was apparently also approved in June of 1968. On April 28, 1969, the city as "Local Public Agency" (see Ill. Rev. Stat. 1969, ch. 24, par. 11—11—1, and 42 U.S.C. §1460(h) (1976)) and the Federal Government, through the Department of Housing and Urban Development (HUD), entered into a loan and capital grant contract covering this urban renewal project. The city entered into the contract in order to enable it to acquire land in the renewal area and make it available for redevelopment in accordance with the uses specified in the urban renewal plan.

The city began acquiring property in the conservation area in late 1969 by outright purchase and by condemnation proceedings. The acquisition of property continued in 1970 and 1971. The title to land so acquired was placed in the city of Carbondale.

On September 14, 1971, the city passed Ordinance No. 1651. One of its functions was to repeal the prior ordinance creating a conservation board for the city. The ordinance expressly ratified and affirmed all valid acts of the conservation board taken pursuant to the Urban Community Conservation Act and stated that all conservation areas already designated in the city under the Act would remain in full force and effect and be known thereafter as urban renewal project areas. The ordinance also authorized the city council to designate additional urban renewal project areas and adopt urban renewal plans concerning them. This grant of power was expressed in language similar to that found in section 5 of the Urban Community Conservation Act (Ill. Rev. Stat. 1971, ch. 67½, par. 91.12).

At the time of passage of Ordinance No. 1651 the city was not a home-rule municipality as defined in the Illinois Constitution of 1970 (Ill. Const. 1970, art. VII, §6(a)). Its authority to carry forward the programs of the Urban Community Conservation Act in the absence of a conservation board created under the Act derived from section 11—11—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1971, ch. 24, par. 11—11—1). That section authorized the corporate authorities of municipalities

without home-rule powers to acquire any real property necessary or appropriate for the rehabilitation or redevelopment of any conservation area as defined in the Urban Community Conservation Act and to sell such property as was not required for the public purposes of the municipality. The section further provided that if the municipality selling the property were a local public agency under an urban renewal project, as the city of Carbondale was by virtue of its contract with HUD, its corporate authorities would have the same powers and be subject to the same conditions, restrictions, limitations, penalties and definitions of terms, and employ the same modes of procedure in the conveyance of real property as are prescribed in sections 15 through 19 of the Urban Renewal Consolidation Act of 1961 (Ill. Rev. Stat. 1971, ch. 67½, pars. 91.115-91.119). One such restriction found in section 18 of that Act (Ill. Rev. Stat. 1971, ch. 67½, par. 91.118) is that any real property lying within the area of the redevelopment project which has not been sold by the municipality within five years after it has acquired title to all the real property within the area of the redevelopment project must be immediately sold by the municipality at public sale for cash to the highest bidder obligating himself in a certain manner to redevelop the property in accordance with the approved plan.

Subsequent to the passage of Ordinance No. 1651, the city continued to acquire property in the urban renewal area without the benefit of the conservation board as agent. The last parcel in the area obtained by purchase or condemnation was acquired on June 2, 1972. The city became a home-rule municipality shortly thereafter on the basis of its increased population. On September 19, 1977, the city adopted an ordinance vacating various streets and alleys in the urban renewal area for which the city declared it had no further use. This ordinance was later amended on January 9, 1978, by an ordinance which corrected the legal description of two of the vacated alleys contained in the prior ordinance. Finally, on August 7, 1978, the city adopted the three ordinances which precipitated these suits. All three ordinances were expressly adopted pursuant to the city's home-rule powers based on findings that the subject matter of each ordinance pertained to the government and affairs of the city. Ordinance No. 78-72 authorized the city to sell the property involved here to private parties for redevelopment in accordance with the city's urban renewal plan. The main objective of the proposed sales was to increase housing for low income, elderly and handicapped persons within the city. The ordinance provided that the method of sale would be controlled by the rules and regulations concerning the disposal of land promulgated by HUD in the Urban Renewal Handbook (Urban Renewal Handbook, 7214.1 REV, Land Marketing and Redevelopment, ch. 5, secs. 63-76). The HUD guidelines allow sale by any method permitted by State

or local law. The city apparently favored private negotiation and on the same day authorized the sale of separate sections of the property through Ordinance Nos. 78-73 and 78-74 to UMIC Securities Corporation and First National Bank and Trust Company of Carbondale as trustee for a land trust in accordance with the terms of prior offers to them contained in respective contracts for sale dated December 14, 1976, and June 10, 1977. All of the land authorized to be sold in Ordinance No. 78-72 was involved in the subsequent two ordinances. The sales were consummated the following day, August 8, 1978.

The primary thrusts of the plaintiffs' complaints were that the city's dispositions of these parcels of land were invalid because they were not conducted in accordance with section 6 of the Urban Community Conservation Act (Ill. Rev. Stat. 1977, ch. 67½, par. 91.13) in that the parcels of land, which had all been held over five years prior to the sales, were not sold to the highest bidder at public sale as required by that section. This argument, of course, rests upon the plaintiffs' belief that the city had no power to act other than as provided for in the Urban Community Conservation Act. In support of this proposition, plaintiffs argue that the passage of Ordinance No. 1651 dissolving the conservation board was void because the city had no authority under State law to administer urban renewal property except through the Urban Community Conservation Act and that the city's adoption of HUD guidelines for disposition of renewal property through Ordinance No. 78-72 rather than those contained in the Urban Community Conservation Act was an unconstitutional use of home-rule power and therefore void.

■■ As our recitation of the facts indicates, at the time of the passage of Ordinance No. 1651 repealing the ordinance creating a conservation board for the city, section 11—11—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1971, ch. 24, par. 11—11—1) expressly empowered the corporate authorities of non-home-rule municipalities to pursue urban rehabilitation on their own behalf in the same manner as conservation boards could as agents of the municipalities under the Urban Community Conservation Act. Since the city of Carbondale was then a non-home-rule municipality, there was nothing preventing it from abolishing its former agent by repealing the ordinance creating it and acting in its own stead under section 11—11—1 of the Code. Consequently, the repeal of the ordinance creating the conservation board was valid and severed any connection between the urban renewal area and the Urban Community Conservation Act.

The defendants present alternative arguments in support of the validity of the transfers of the property. One argument is based on statutory compliance and the other on home-rule power.

In the statutory argument, defendants assert that section 18 of the Urban Renewal Consolidation Act of 1961 (Ill. Rev. Stat. 1977, ch. 67½, par. 91.118) is applicable to the dispositions of these parcels of land through section 11—11—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 11—11—1), but argue that the parcels were properly sold in a private sale because they were not subject to the five-year public-sale restriction contained in section 18. Their specific contention is that the parcels were sold within five years after the city acquired title to all the property within the urban renewal area and thus were not required to be sold at public sale because the last title to such property was acquired in January of 1978 when certain alleys and streets were vacated.

■■ ■ Assuming for the moment that section 18 is applicable, we find defendants' argument to be without merit because it misconstrues the significance of the vacation of the streets and alleys. Section 18 of the Urban Renewal Consolidation Act of 1961 (Ill. Rev. Stat. 1977, ch. 67½, par. 91.118) provides in pertinent part that:

> "Any real property lying within the area of the redevelopment project which has not been sold by the Department within five years after the Department has acquired title to all the real property within the area of that redevelopment project, shall be forthwith sold by the Department at public sale for cash to the highest bidder * * *."

The term "department" in the above quoted section must be read "municipality as local public agency" when the section is applied by virtue of section 11—11—1 of the Illinois Municipal Code. (See Ill. Rev. Stat. 1977, ch. 24, par. 11—11—1.) Since the city was admittedly a local public agency as defined by Federal law (42 U.S.C. §1460(h) (1976)), the only question left under the statute is when did the city acquire title to the last piece of property in the urban renewal area so as to start the running of the five-year period. Defendants argue that this occurred when the last alley was vacated by ordinance in January of 1978, thereby freeing that property for resale as part of the project. We cannot agree with this argument, since the city held title to the land which comprised the streets and alleys involved here at all relevant times. It did not acquire any title to these parcels by vacating them as public ways, rather they merely affected the manner in which they might be used. Since the city could have provided for vacation at any time, we feel compelled to hold that title to all the real property within the urban renewal area was acquired on June 2, 1972, the last date on which a parcel was obtained by purchase. Were validity accorded to the city's argument regarding the "time of last acquisition" it would permit them to ignore the clear limitation of five years imposed in the statute, a provision for relatively prompt disposition that is a cornerstone of the statutory urban renewal

process. By withholding action on changing the mode of public use of the streets and alleys in the renewal area, the city could postpone "final acquisition" for an indefinite period of time, an obvious frustration of the statutory scheme. Since the sales were made in August of 1978, more than five years from June 2, 1972, the sales would have been made contrary to law if the restriction of section 18 of the Urban Renewal Consolidation Act of 1961 applied to these dispositions. It is our holding, however, that this restriction was not applicable to these sales because they were made in accordance with the city's exercise of its home-rule powers.

By virtue of its increased population, the city of Carbondale is now and has been a home-rule municipality as defined in the Illinois Constitution of 1970 (Ill. Const. 1970, art. VII, §6(a)) since at least June 27, 1972. As a home-rule unit it possessed at all relevant times the following powers under our constitution:

> "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare * * *." Ill. Const. 1970, art. VII, §6(a).

As we have already noted, the city passed Ordinance No. 78-72 expressly authorizing the sale of these parcels pursuant to its home rule powers. The ordinance provided that any sales of urban renewal property would be executed in compliance with certain HUD guidelines which contained no restriction similar to that of the State statute with respect to requiring the public sale of property held for a stated period of time. Since our examination of the record reveals that the present sales complied with the HUD guidelines, all we need do to decide whether these sales were valid is to determine whether Ordinance No. 78-72 was a proper exercise of the city's home-rule powers.

The first question we must ask is whether the subject matter of this ordinance pertained to the government and affairs of the city. In deciding this question, we must keep in mind that the terms of the grant of powers to home-rule units were purposely left without definition so that they might be broad (*City of Urbana v. Houser* (1977), 67 Ill. 2d 268, 367 N.E.2d 692; *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 338 N.E.2d 15) and that the framers of our constitution expressly provided that the "[p]owers and functions of home rule units shall be construed liberally" (Ill. Const. 1970, art. VII, §6(m)). Actually, it does not require any liberal construction to conclude that urban renewal matters and the means by which redevelopment sales are entered into are matters of local concern which pertain to the affairs of the city wherein the problem necessitating the urban renewal efforts exists.

The extremely broad grant of powers to home-rule units contained

in article VII, section 6(a) of the Illinois Constitution of 1970 reflects the new relationship which exists between local and State government. In the past, local governmental units had only those powers which were authorized, either expressly or impliedly, by the grant of authority of the legislature. Since the effective date of the 1970 Constitution, however, home-rule units have had an autonomy and independence limited only by the restrictions imposed or authorized by the constitution. (*Kanellos v. County of Cook* (1972), 53 Ill. 2d 161, 290 N.E.2d 240.) As our supreme court noted in *City of Urbana v. Houser* (1977), 67 Ill. 2d 268, 273, 367 N.E.2d 692, 694, "[h]ome rule units \* \* \* have the same powers as the sovereign except where such powers are limited by the General Assembly." Thus, the final question is whether the city's power as a home-rule unit to adopt a method for disposition of urban renewal property has been limited by the General Assembly as authorized by the constitution. We find that it has not.

■■■ Subsections (g), (h) and (i) of section 6 of article VII of the Illinois Constitution of 1970 provide three methods by which the General Assembly may restrict home-rule powers. First, it may pass a law by a three-fifths majority denying or limiting a home-rule power (Ill. Const. 1970, art. VII, §6(g)); second, it may pass a law specifically declaring the State's exercise of a home-rule power or function to be exclusive (Ill. Const. 1970, art. VII, §6(h)); and, third, it may pass a law specifically limiting a home-rule unit's concurrent exercise of a power with the State (Ill. Const. 1970, art. VII, §6(i)). In this case, the General Assembly has employed none of these methods, and we must consequently uphold both the ordinances of 1978 and the sales of property made pursuant thereto. Certainly neither section 6 of Urban Community Conservation Act (Ill. Rev. Stat. 1977, ch. 67½, par. 91.13) nor section 18 of the Urban Renewal Consolidation Act of 1961 (Ill. Rev. Stat. 1977, ch. 67½, par. 91.118) as applied through section 11—11—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 11—11—1) may be interpreted as having limited or denied the city's power to establish its own mode for disposition of urban renewal property, since all of these sections and acts were passee prior to the adoption of the new Illinois constitution. Our supreme court has consistently held that for legislation to restrict the home-rule power, the statute, besides complying with the constitutional requirements, must have been enacted subsequent to the adoption of our constitution. Moreover, a home-rule unit's exercise of its power, as was done here, will supersede any conflicting pre-1970 Constitution legislation. (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553, and cases cited therein.) We note also that none of these statutes contains an express statement to the effect that it limits or denies any home-rule power, as is required by the constitution. (See

*Rozner v. Korshak* (1973), 55 Ill. 2d 430, 303 N.E.2d 389; *Stryker v. Village of Oak Park* (1976), 62 Ill. 2d 523, 343 N.E.2d 919.) In addition, our research has failed to reveal any post-constitution legislation which denies, limits or preempts the exercise of this particular home-rule power.

Affirmed.

G. MORAN and KARNS, JJ., concur.