Victor D. QUILICI, Robert Stengl, et al., George L. Reichert, and Robert E. Metler, Plaintiffs-Appellants,

v.

VILLAGE OF MORTON GROVE, et al., Defendants-Appellees.

Nos. 82–1045, 82–1076 and 82–1132.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1982.

Decided Dec. 6, 1982.

As Amended Dec. 10, 1982.

Rehearing and Rehearing En Banc Denied March 2, 1983.

Victor D. Quilici, Bennsonville, Ill., Don B. Kates, Jr., O'Brien & Hallisey, San Francisco, Cal., Richard V. Houpt, Pedersen & Houpt, Donald J. Moran, Chicago, Ill., for plaintiffs-appellants.

Eugene R. Wedoff, Jenner & Block, Chicago, Ill., for defendants-appellees.

Before BAUER, WOOD, and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

This appeal concerns the constitutionality of the Village of Morton Grove's Ordinance No. 81–11,[1] which prohibits the possession of handguns within the Village's borders.

1. Ordinance No. 81–11, in pertinent part, provides:

AN ORDINANCE REGULATING THE POSSESSION OF FIREARMS AND OTHER DANGEROUS WEAPONS

Whereas, it has been determined that in order to promote and protect the health and safety and welfare of the public it is necessary to regulate the possession of firearms and other dangerous weapons, and

Whereas, the Corporate Authorities of the Village of Morton Grove have found and determined that the easy and convenient availability of certain types of firearms and weapons have increased the potentiality of firearm related deaths and injuries, and

Whereas, handguns play a major role in the commission of homicide, aggravated assault, and armed robbery, and accidental injury and death.

Now, Therefore, Be It Ordained By The President And Board Of Trustees Of The Village Of Morton Grove, Cook County, Illinois, As Follows:

Section 1: The Corporate Authorities do hereby incorporate the foregoing Whereas clauses into the Ordinance, thereby making the findings as hereinabove set forth.

Section 2: That Chapter 132 of the Code of Ordinances of the Village of Morton Grove be and is hereby amended by the addition of the following section:

"*Section* 132.102. Weapons Control

*(A) Definitions:*

Firearm: "Firearm" means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas; excluding however;

(1) Any pneumatic gun, spring gun or B–B gun which expels a single globular projectile not exceeding .18 inches in diameter.

(2) Any device used exclusively for signalling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission.

(3) Any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial ammunition.

(4) An antique firearm (other than a machine gun) which, although designed as a weapon, the Department of Law Enforcement of the State of Illinois finds by reason of the date of its manufacture, value, design and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

(5) Model rockets designed to propel a model vehicle in a vertical direction.

Handgun: Any firearm which (a) is designed or redesigned or made or remade, and intended to be fired while held in one hand or (b) having a barrel of less than 10 inches in length or (c) a firearm of a size which may be concealed upon the person.

Person: Any individual, corporation, company, association, firm, partnership, club, society or joint stock company.

Handgun Dealer: Any person engaged in the business of (a) selling or renting handguns at wholesale or retail (b) manufacture of handguns (c) repairing handguns or making or firing special barrels or trigger mechanisms to handguns.

Licensed Firearm Collector: Any person licensed as a collector by the Secretary of the Treasury of the United States under and by virtue of Title 18, United States Code, Section 923.

Licensed Gun Club: A club or organization, organized for the purpose of practicing shooting at targets, licensed by the Village of Morton Grove under Section 90.20 of the Code of Ordinances of the Village of Morton Grove.

*(B) Possession:*

The district court held that the Ordinance was constitutional. We affirm.

I

Victor D. Quilici initially challenged Ordinance No. 81–11 in state court. Morton Grove removed the action to federal court where it was consolidated with two similar actions, one brought by George L. Reichert and Robert E. Metler (collectively Reichert) and one brought by Robert Stengl, Martin Gutenkauf, Alice Gutenkauf, Walter J. Dutchak and Geoffrey Lagonia (collectively Stengl). Plaintiffs alleged that Ordinance No. 81–11 violated article I, section 22 of the Illinois Constitution and the second, ninth and fourteenth amendments of the

> No person shall possess, in the Village of Morton Grove the following:
>
> (1) Any bludgeon, black-jack, slug shot, sand club, sand bag, metal knuckles or any knife, commonly referred to as a switchblade knife, which has a blade that opens automatically by hand pressure applied to a button, spring, or other device in the handle of the knife, or
>
> (2) Any weapon from which 8 or· more shots or bullets may be discharged by a single function of the firing device, any shotgun having one or more barrels less than 18 inches in length, sometimes called a sawed off shotgun or any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon, as modified or altered has an overall length of less than 26 inches, or a barrel length of less than 18 inches or any bomb, bomb-shell, grenade, bottle or other container containing an explosive substance of over one-quarter ounce for like purposes, such as, but not limited to black powder bombs and molotov cocktails or artillery projectiles; or
>
> (3) Any handgun, unless the same has been rendered permanently inoperative.
>
> *(C) Subsection B(1) shall not apply to or affect any peace officer.*
>
> *(D) Subsection B(2) shall not apply to or affect the following:*
>
> (1) Peace officers;
>
> (2) Wardens, superintendents and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of an offense;
>
> (3) Members of the Armed Services or Reserve Forces of the United States or the Illinois National Guard, while in the performance of their official duties; and
>
> (4) Transportation of machine guns to those persons authorized under Subparagraphs (1) and (2) of this subsection to possess machine guns, if the machine guns are broken down in a non-functioning state or not immediately accessible.
>
> *(E) Subsection B(3) does not apply to or affect the following:*
>
> (1) Peace officers or any person summoned by any peace officer to assist in making arrests or preserving the peace while he is actually engaged in assisting such officer and if such handgun was provided by the peace officer;
>
> (2) Wardens, superintendents and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of an offense;
>
> (3) Members of the Armed Services or Reserve Forces of the United States or the Illinois National Guard or the Reserve Officers Training Corps while in the performance of their official duties.
>
> (4) Special Agents employed by a railroad or a public utility to perform police functions; guards of armored car companies; watchmen and security guards actually and regularly employed in the commercial or industrial operation for the protection of persons employed and private property related to such commercial or industrial operation;
>
> (5) Agents and investigators of the Illinois Legislative Investigating Commission authorized by the commission to carry such weapons;
>
> (6) Licensed gun collectors;
>
> (7) Licensed gun clubs provided the gun club has premises from which it operates and maintains possession and control of handguns used by its members, and has procedures and facilities for keeping such handguns in a safe place, under the control of the club's chief officer, at all times when they are not being used for target shooting or other sporting or recreational purposes at the premises of the gun club; and gun club members while such members are using their handguns at the gun club premises;
>
> (8) A possession of an antique firearm;
>
> (9) Transportation of handguns to those persons authorized under Subparagraphs 1 through 8 of this subsection to possess handguns, if the handguns are broken down in a non-functioning state or not immediately accessible.
>
> (10) Transportation of handguns by persons from a licensed gun club to another licensed gun club or transportation from a licensed gun club to a gun club outside the limits of Morton Grove; provided however that the transportation is for the purpose of engaging in competitive target shooting or for the purpose of permanently keeping said handgun at such new gun club; and provided further that at all times during such transportation said handgun shall have trigger locks securely fastened to the handgun.

United States Constitution. They sought an order declaring the Ordinance unconstitutional and permanently enjoining its enforcement. The parties filed cross motions for summary judgment. The district court granted Morton Grove's motion for summary judgment and denied plaintiffs' motions for summary judgment.

In its opinion, *Quilici v. Village of Morton Grove,* 532 F.Supp. 1169 (N.D.Ill. 1981), the district court set forth several reasons for upholding the handgun ban's validity under the state and federal constitutions. First, it held that the Ordinance which banned only certain kinds of arms was a valid exercise of Morton Grove's police power and did not conflict with section 22's conditional right to keep and bear arms. Second, relying on *Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), the court concluded that the second amendment's guarantee of the right to bear arms has not been incorporated into the fourteenth amendment and, therefore, is inapplicable to Morton Grove. Finally, it stated that the ninth amendment does not include the right to possess handguns for self-defense. Appellants contend that the district court incorrectly construed the relevant constitutional provisions, assigning numerous errors based on case law, historical analysis, common law traditions and public policy concerns.[2]

While we recognize that this case raises controversial issues which engender strong emotions, our task is to apply the law as it has been interpreted by the Supreme Court, regardless of whether that Court's interpretation comports with various personal views of what the law should be. We are also aware that we must resolve the controversy without rendering unnecessary constitutional decisions. *Richard Nixon v. A. Ernest Fitzgerald,* —— U.S. ——, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982). With these principles in mind we address appellants' contentions.

## II

We consider the state constitutional issue first. The Illinois Constitution provides:

> Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed.

Ill. Const. art. I, § 22. The parties agree that the meaning of this section is controlled by the terms "arms" and "police power" but disagree as to the scope of these terms.

Relying on the statutory construction principles that constitutional guarantees should be broadly construed and that consti-

**2.** Three amici briefs were also filed, by the Illinois State Rifle Association, the Handgun Control, Inc., and the States of Arizona, Connecticut, Hawaii, Idaho, Louisiana, Missouri, Montana, Nevada, North Carolina, Oregon and Wyoming collectively. We have considered the arguments raised in these briefs and find that, for the most part, they raise the same arguments as those raised by the parties.

However, the states' amici curiae brief raises one issue not raised by the parties or addressed by the district court. The states argue that the district court should have abstained because the federal court may not construe a state constitutional provision when the state court has not yet had the opportunity to construe that provision. Amici Curiae br. at 8. The states admit that abstention is not required when the state constitutional provision parallels the federal constitutional provision. However, relying on *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), they assert that the state constitutional provision involved in this case is unique, and thus, the federal court should not have prematurely usurped the state's prerogative to interpret its own constitution.

We disagree. Since abstention is not mandatory, the federal court must determine whether abstention is appropriate in a particular case. 1A Moore's Federal Practice § 0.203[1] at 2105 (1977). Federal courts have been reluctant to abstain when fundamental rights such as voting, racial equality or rights of expression are involved. *Id.* at 2111–12. We consider the issue of gun control of vital importance to every citizen and, for this reason, do not believe that abstention is any more appropriate in this case than in cases where fundamental rights are involved. Moreover, the purpose of the abstention doctrine is to minimize the conflict between the federal and state systems. *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). There is no conflict here, for Morton Grove voluntarily removed this case to federal court. Accordingly, we find that the abstention doctrine has no relevance.

tutional provisions should prevail over conflicting statutory provisions, appellants allege that section 22's guarantee of the right to keep and bear arms prohibits a complete ban of any one kind of arm. They argue that the constitutional history of section 22 establishes that the term "arms" includes those weapons commonly employed for "recreation or the protection of person and property," 6 Record of Proceedings, Sixth Illinois Constitutional Convention 87 (Proceedings), and contend that handguns have consistently been used for these purposes.

Appellants concede that the phrase "subject to the police power" does not prohibit reasonable regulation of arms. Thus, they admit that laws which require the licensing of guns or which restrict the carrying of concealed weapons or the possession of firearms by minors, convicted felons, and incompetents are valid. However, they maintain that no authority supports interpreting section 22 to permit a ban on the possession of handguns merely because alternative weapons are not also banned. They argue that construing section 22 in this manner would lead to the anomalous situation in which one municipality completely bans handguns while a neighboring municipality completely bans all arms but handguns.

In contrast, Morton Grove alleges that "arms" is a general term which does not include any specific kind of weapon. Relying on section 22's language, which they characterize as clear and explicit, Morton Grove reads section 22 to guarantee the right to keep only some, but not all, arms which are used for "recreation or the protection of person and property." It argues that the Ordinance passes constitutional muster because standard rifles and shotguns are also used for "recreation or the protection of person and property" and Ordinance No. 81–11 does not ban these weapons.

While Morton Grove does not challenge appellants' assertion that "arms" includes handguns, we believe that a discussion of the kind of arms section 22 protects is an appropriate place to begin our analysis. Because we disagree with Morton Grove's assertion that section 22's language is clear and explicit, we turn to the constitutional debates for guidance on the proper construction of arms.[3] *Client Follow-Up Co. v. Hynes,* 75 Ill.2d 208, 216, 28 Ill.Dec. 488, 390 N.E.2d 847, 850 (1979), citing *Wolfson v. Avery,* 6 Ill.2d 78, 126 N.E.2d 701 (1955).[4]

The debates indicate that the category of arms protected by section 22 is not limited to military weapons; the framers also intended to include those arms that "law-abiding persons commonly employ[ed]" for "recreation or the protection of person and property." 6 Proceedings 87. Handguns are undisputedly the type of arms commonly used for "recreation or the protection of person and property."

Our conclusion that the framers intended to include handguns in the class of protected arms is supported by the fact that in discussing the term the Proceedings refer to *People v. Brown,* 253 Mich. 537, 541–42, 235 N.W. 245, 246–47 (1931) and *State v. Duke,*

---

**3.** In construing section 22, the district court also relied heavily on the constitutional debates. Appellants challenge this reliance, arguing that constitutional ambiguities are best resolved by the voters' understanding at the time of the vote on the proposed constitution. Appellants contend that the voters' understanding should be gleaned from: (1) the Official Explanation published prior to the ratification vote; (2) newspaper articles discussing the proposed section 22; and (3) the meaning which the voters were likely to have attributed to the term "police power." Since the district court thoroughly analyzed, and properly rejected, this theory of statutory construction, *Quilici v. Village of Morton Grove,* 532 F.Supp. at 1174–75, we need not repeat that analysis here.

**4.** Reichert cites *Client Follow-Up Co. v. Hynes,* 75 Ill.2d 208, 28 Ill.Dec. 488, 390 N.E.2d 847 (1979) to support his assertion that the district court erroneously relied on the constitutional convention debates to construe section 22. He contends that *Client Follow-Up* holds that constitutional convention debates are useful only when those debates demonstrate a consensus among the delegates. Reichert correctly states the *Client Follow-Up* holding, but ignores the fact that the Proceedings indicate a majority consensus among the delegates as to the meaning of section 22. *See, e.g.,* 3 Proceedings 1711, 1717–19, 1818.

42 Tex. 455, 458 (1875). *Brown* defines weapons as those "relied upon ... for defense or pleasure," including "ordinary guns" and "revolvers." 253 Mich. at 542, 235 N.W. at 247. *Duke* states that "[t]he arms which every person is secured the right to keep and bear (in defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, ... and are appropriate for ... self-defense, as well as such as are proper for the defense of the State." 42 Tex. at 458. The delegates' statements and reliance on *Brown* and *Duke* convinces us that the term arms in section 22 includes handguns.

Having determined that section 22 includes handguns within the class of arms protected, we must now determine the extent to which a municipality may exercise its police power to restrict, or even prohibit, the right to keep and bear these arms. The district court concluded that section 22 recognizes only a narrow individual right which is subject to substantial legislative control. It noted that "[t]o the extent that one looks to the convention debate for assistance in reconciling the conflict between the right to arms and the exercise of the police power, the debate clearly supports a narrow construction of the individual right." *Quilici v. Village of Morton Grove,* 532 F.Supp. at 1174. It further noted that while the Proceedings cite some cases holding that the state's police power should be read restrictively, those cases were decided under "distinctly different constitutional provisions" and, thus, have little application to this case. *Id.* at 1176.

We agree with the district court that the right to keep and bear arms in Illinois is so limited by the police power that a ban on handguns does not violate that right. In reaching this conclusion we find two factors significant. First, section 22's plain language grants only the right to keep and bear arms, not handguns. Second, although the framers intended handguns to be one of the arms conditionally protected under section 22, they also envisioned that local governments might exercise their police power to restrict, or prohibit, the right to keep and bear handguns. For example, Delegate Foster, speaking for the majority, explained:

> It could be argued that, in theory, the legislature now [prior to the adoption of the 1970 Illinois Constitution] has the right to ban all firearms in the state as far as individual citizens owning them is concerned. That is the power which we wanted to restrict—an absolute ban on all firearms.

3 Proceedings 1688. Delegate Foster then noted that section 22 "would prevent a complete ban on all guns, but there could be a ban on certain categories." *Id.* at 1693.[5] It is difficult to imagine clearer evidence that section 22 was intended to permit a municipality to ban handguns if it so desired.

Appellants argue that construing section 22 to protect only some unspecified categories of arms, thereby allowing municipalities to exercise their police power to enact dissimilar gun control laws, leads to "untenable" and "absurd" results. Quilici br. at 14. This argument ignores the fact that the Illinois Constitution authorizes local governments to function as home rule units to "exercise any power and perform any function pertaining to its government and affairs". Illinois Const. art. VIII, § 6(a). Home rule government[6] is based

---

**5.** The Proceedings are replete with other statements supporting our holding. See, for example, Delegate Foster's statement that "we feel that under ... [section 22] ... the state would have the right to prohibit some classes of firearms, such as war weapons, handguns, or some other category." 3 Proceedings 1818. See also his statement immediately prior to the vote on the proposed section 22 that: "[i]t is the position of the majority that under the police power of the state, the legislature would have the authority, for example, to forbid all handguns

... [and] it is still the position of the majority that short of an absolute and complete ban on the possession of all firearms, this provision would leave the legislature free to regulate the use of firearms in Illinois." 3 Proceedings 1718.

**6.** Ill. Const. Art. VII, § 6(a) provides:
A County which has a chief executive officer elected by the county and any municipality which has a population of more than 25,000 are home rule units. Other municipali-

on the theory that local governments are in the best position to assess the needs and desires of the community and, thus, can most wisely enact legislation addressing local concerns. *Carlson v. Briceland,* 61 Ill. App.3d 247, 18 Ill.Dec. 502, 377 N.E.2d 1138 (1978). Illinois home rule units have expansive powers to govern as they deem proper, *see generally* Hall & Wallack, *Intergovernmental Cooperation and the Transfer of Powers,* 1981 U.Ill.L.Rev. 775, 777–79; Vitullo & Peters, *Intergovernmental Cooperation and the Municipal Insurance Crisis,* 30 DePaul L.Rev. 325, 326–29 (1981); including the authority to impose greater restrictions on particular rights than those imposed by the state. *See City of Evanston v. Create, Inc.,* 85 Ill.2d 101, 51 Ill.Dec. 688, 421 N.E.2d 196 (1981). The only limits on their autonomy are those imposed by the Illinois Constitution, *City of Carbondale ex rel. Ham v. Eckert,* 76 Ill.App.3d 881, 32 Ill.Dec. 377, 395 N.E.2d 607 (1979), or by the Illinois General Assembly exercising its authority to pre-empt home rule in specific instances. Because we have concluded that the Illinois Constitution permits a ban on certain categories of arms, home rule units such as Morton Grove may properly enact different, even inconsistent, arms restrictions. This is precisely the kind of local control envisioned by the new Illinois Constitution.

Appellants concede that municipalities may, under the Illinois Constitution, exercise their police power to enact regulations which prohibit "possession of items legislatively found to be dangerous ...", Quilici br. at 9. They draw a distinction, however, between the exercise of the police power in general and the exercise of police power with respect to a constitutionally protected right. Indeed, they vehemently insist that a municipality may not exercise its police power to completely prohibit a constitutional guarantee.

We agree that the state may not exercise its police power to violate a positive constitutional mandate, *People v. Warren,* 11 Ill.2d 420, 143 N.E.2d 28 (1957), but we reiterate that section 22 simply prohibits an absolute ban on all firearms. Since Ordinance No. 81–11 does not prohibit all firearms, it does not prohibit a constitutionally protected right. There is no right under the Illinois Constitution to possess a handgun, nor does the state have an overriding state interest in gun control which requires it to retain exclusive control in order to prevent home rule units from adopting conflicting enactments. *See City of Evanston v. Create, Inc.,* 85 Ill.2d 101, 51 Ill.Dec. 688, 421 N.E.2d 196 (1981). Accordingly, Morton Grove may exercise its police power to prohibit handguns even though this prohibition interferes with an individual's liberty or property. *People v. Warren,* 11 Ill.2d 420, 143 N.E.2d 28 (1957).

The Illinois Constitution establishes a presumption in favor of municipal home rule. *Carlson v. Briceland,* 61 Ill. App.3d 247, 18 Ill.Dec. 502, 377 N.E.2d 1138 (1978). Once a local government identifies a problem and enacts legislation to mitigate or eliminate it, that enactment is presumed valid and may be overturned only if it is unreasonable, clearly arbitrary, and has no foundation in the police power. *Illinois Gamefowl Breeders Ass'n v. Block,* 75 Ill.2d 443, 27 Ill.Dec. 465, 389 N.E.2d 529 (1979); *People v. Copeland,* 92 Ill.App.3d 475, 47 Ill.Dec. 860, 415 N.E.2d 1173 (1st Dist.1980). Thus, it is not the province of this court to pass judgment on the merits of Ordinance No. 81–11; our task is simply to determine whether Ordinance No. 81–11's restrictions are rationally related to its stated goals. *People ex rel. Difanis v. Barr,* 83 Ill.2d 191, 46 Ill.Dec. 678, 414 N.E.2d 731 (1980). As the district court noted, there is at least

ties may elect by referendum to become home rule units. Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax and to incur debt.

The parties do not dispute the fact that Morton Grove is a home rule unit and the court notes that, in 1980, Morton Grove passed a referendum maintaining its home rule status pursuant to Ill. Const. Art. VII, § 6(a).

some empirical evidence that gun control legislation may reduce the number of deaths and accidents caused by handguns. *Quilici v. Village of Morton Grove,* 532 F.Supp. at 1179. This evidence is sufficient to sustain the conclusion that Ordinance No. 81–11 is neither wholly arbitrary nor completely unsupported by any set of facts. *People v. Copeland,* 92 Ill.App.3d 475, 47 Ill.Dec. 860, 415 N.E.2d 1173 (1st Dist.1980). Accordingly, we decline to consider plaintiffs' arguments that Ordinance No. 81–11 will not make Morton Grove a safer, more peaceful place.

We agree with the district court that Ordinance No. 81–11: (1) is properly directed at protecting the safety and health of Morton Grove citizens; (2) is a valid exercise of Morton Grove's police power; and (3) does not violate any of appellants' rights guaranteed by the Illinois Constitution.[7]

### III

We next consider whether Ordinance No. 81–11 violates the second amendment to the United States Constitution. While appellants all contend that Ordinance No. 81–11 is invalid under the second amendment, they offer slightly different arguments to substantiate this contention. All argue, however, that the second amendment applies to state and local governments and that the second amendment guarantee of the right to keep and bear arms exists, not only to assist in the common defense, but also to protect the individual. While reluctantly conceding that *Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), held that the second amendment applied only to action by the federal government, they nevertheless assert that *Presser* also held that the right to keep and bear arms is an attribute of national citizenship which is not subject to state restriction. Reichert br. at 36. Finally, apparently responding to the district court's comments that "[p]laintiffs ... have not suggested that the Morton Grove Ordinance in any way interferes

with the ability of the United States to maintain public security ..." *Quilici v. Village of Morton Grove,* 532 F.Supp. at 1169, Quilici and Reichert argue in this court that the Morton Grove Ordinance interferes with the federal government's ability to maintain public security by preventing individuals from defending themselves and the community from "external or internal armed threats." Quilici br. at 12; Reichert br. at 37–38. These are the same arguments made in the district court. Accordingly, we comment only briefly on the points already fully analyzed in that court's decision.

As we have noted, the parties agree that *Presser* is controlling, but disagree as to what *Presser* held. It is difficult to understand how appellants can assert that *Presser* supports the theory that the second amendment right to keep and bear arms is a fundamental right which the state cannot regulate when the *Presser* decision plainly states that "[t]he Second Amendment declares that it shall not be infringed, but this ... means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the National government ...." *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886). As the district court explained in detail, appellants' claim that *Presser* supports the proposition that the second amendment guarantee of the right to keep and bear arms is not subject to state restriction is based on dicta quoted out of context. *Quilici v. Village of Morton Grove,* 532 F.Supp. at 1181–82. This argument borders on the frivolous and does not warrant any further consideration.

Apparently recognizing the inherent weakness of their reliance on *Presser,* appellants urge three additional arguments to buttress their claim that the second amendment applies to the states. They contend that: (1) *Presser* is no longer good law because later Supreme Court cases in-

---

7. We note that *Kalodimos v. Village of Morton Grove,* 81 Ch. 6424 slip op. (Cook County, Ill. Jan. 29, 1982) in which Reichert was one of several plaintiffs, is consistent with our analysis here.

corporating other amendments into the fourteenth amendment have effectively overruled *Presser,* Reichert br. at 52; (2) *Presser* is illogical, Quilici br. at 12; and (3) the entire Bill of Rights has been implicitly incorporated into the fourteenth amendment to apply to the states, Reichert br. at 48–52.

None of these arguments has merit. First, appellants offer no authority, other than their own opinions, to support their arguments that *Presser* is no longer good law or would have been decided differently today. Indeed, the fact that the Supreme Court continues to cite *Presser, Malloy v. Hogan,* 378 U.S. 1, 4 n. 2, 84 S.Ct. 1489, 1491 n. 2, 12 L.Ed.2d 653 (1964), leads to the opposite conclusion. Second, regardless of whether appellants agree with the *Presser* analysis, it is the law of the land and we are bound by it. Their assertion that *Presser* is illogical is a policy matter for the Supreme Court to address. Finally, their theory of implicit incorporation is wholly unsupported. The Supreme Court has specifically rejected the proposition that the entire Bill of Rights applies to the states through the fourteenth amendment. *Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947), *overruled on other grounds, Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937); *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908).

Since we hold that the second amendment does not apply to the states, we need not consider the scope of its guarantee of the right to bear arms. For the sake of completeness, however, and because appellants devote a large portion of their briefs to this issue, we briefly comment on what we believe to be the scope of the second amendment.

■■■ The second amendment provides that "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Construing this language according to its plain meaning, it seems clear that the right to bear arms is inextricably connected to the preservation of a militia. This is precisely the manner in which the Supreme Court interpreted the second amendment in *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), the only Supreme Court case specifically addressing that amendment's scope. There the Court held that the right to keep and bear arms extends only to those arms which are necessary to maintain a well regulated militia.

In an attempt to avoid the *Miller* holding that the right to keep and bear arms exists only as it relates to protecting the public security, appellants argue that "[t]he fact that the right to keep and bear arms is joined with language expressing one of its purposes in no way permits a construction which limits or confines the exercise of that right." Reichert br. at 35. They offer no explanation for how they have arrived at this conclusion. Alternatively, they argue that handguns are military weapons.[8] Stengl's br. at 11–13. Our reading of *Miller* convinces us that it does not support either of these theories. As the Village correctly notes, appellants are essentially arguing that *Miller* was wrongly decided and should be overruled. Such arguments have no place before this court. Under the controlling authority of *Miller* we conclude that the right to keep and bear handguns is not guaranteed by the second amendment.[9]

---

**8.** Appellants devote a portion of their briefs to historical analysis of the development of English common law and the debate surrounding the adoption of the second and fourteenth amendments. This analysis has no relevance on the resolution of the controversy before us. Accordingly, we decline to comment on it, other than to note that we do not consider individually owned handguns to be military weapons.

**9.** A similar conclusion has been reached by numerous other courts. *United States v. Oakes,* 564 F.2d 384 (6th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978); *United States v. Warin,* 530 F.2d 103 (6th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976); *Cody v. United States,* 460 F.2d 34 (8th Cir.), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d

■ Because the second amendment is not applicable to Morton Grove and because possession of handguns by individuals is not part of the right to keep and bear arms, Ordinance No. 81–11 does not violate the second amendment.

## IV

■ Finally, we consider whether Ordinance No. 81–11 violates the ninth amendment. Appellants argue that, although the right to use commonly-owned arms for self-defense is not explicitly listed in the Bill of Rights, it is a fundamental right protected by the ninth amendment. Citing no authority which directly supports their contention, they rely on the debates in the First Congress and the writings of legal philosophers to establish that the right of an individual to own and possess firearms for self-defense is an absolute and inalienable right which cannot be impinged.

Since appellants do not cite, and our research has not revealed, any Supreme Court case holding that any specific right is protected by the ninth amendment, appellants' argument has no legal significance. Appellants may believe the ninth amendment should be read to recognize an unwritten, fundamental, individual right to own or possess firearms; the fact remains that the Supreme Court has never embraced this theory.[10]

## V

Reasonable people may differ about the wisdom of Ordinance No. 81–11. History may prove that the Ordinance cannot effectively promote peace and security for Morton Grove's citizens. Such issues, however, are not before the court. We simply hold the Ordinance No. 81–11 is a proper exercise of Morton Grove's police power and does not violate art. I, § 22 of the Illinois Constitution or the second, ninth, or fourteenth amendments of the United States Constitution. Accordingly, the decision of the district court is

AFFIRMED.

303 (1972); *Stevens v. United States,* 440 F.2d 144 (6th Cir.1971).

COFFEY, Circuit Judge, dissenting.

The constitutions of the United States and the respective states define and delineate the powers of our various governmental units. As a fundamental principle, if a governing body (federal, state or local) should at any time overstep its limits the judiciary must act as a constitutional check. This was the intent of the framers of the Constitution as evidenced by their dividing the powers and responsibilities of the government into three separate and distinct branches. Specifically, if a legislative body enacts a law exceeding the constitutional limits of its authority, it is the responsibility and the duty of an independent judiciary to declare it void.

With this principle in mind and conscious of the magnitude of the political and social implications of this case, I am compelled to dissent from my brethren today. It is my opinion that the Village of Morton Grove has improperly legislated beyond the legitimate parameters of its authority.

I base my conclusion upon three grounds. First, Morton Grove Ordinance No. 81–11 is an impermissible attempt by the governing body of the Village to address an issue which the people of the State of Illinois through their elected representatives have deemed to be a matter properly resolved by state action. The state's longstanding and comprehensive regulation and prohibition of handgun possession preempts local legislation on the subject. Second, and closely related to the first, I believe that the Ordinance is invalid under the home rule provisions of the Illinois Constitution in that the regulation of handgun possession is a matter of statewide rather than local concern and the Morton Grove Ordinance contradicts state law regarding the possession of handguns. Third, I believe that Morton Grove Ordinance No. 81–11, as a matter of constitutional law, impermissibly interferes

**10.** Appellants also argued, in the district court, that Ordinance No. 81–11 violated the fifth amendment and is unconstitutionally vague. These arguments were not raised in this court.

with individual privacy rights. I join others who throughout history have recognized that an individual in this country has a protected right, within the confines of the criminal law, to guard his or her home or place of business from unlawful intrusions. In my view, today's majority decision marks a new nadir for the fundamental principle that "a man's home is his castle." It has been said that the greatest threat to our liberty is from well-meaning, and almost imperceptible governmental encroachments upon our personal freedom. Today's decision sanctions an intrusion on our basic rights as citizens which would no doubt be alarming and odious to our founding fathers. For the above-cited reasons, which I shall discuss in greater detail herein, I respectfully dissent from the opinion of this court.

## I.

The Village of Morton Grove's Ordinance No. 81–11 is invalid as the law is an improper attempt by the locality to address a subject which has been deemed by the Illinois Legislature to be exclusively a matter of state concern and control. The state legislature, through extensive and long-standing regulation, has preempted the subject of handgun possession.

Although most frequently addressed in the context of federal versus state enactments, the doctrine of preemption has been recognized as also being applicable to situations involving duplicate areas of state and local legislation. The Illinois Supreme Court has recognized that the existence of long-standing and extensive state regulation of a certain subject matter evidences an implied intent to preempt that field to the exclusion of local municipalities. In *Ampersand, Inc. v. Finley,* 61 Ill.2d 537, 338 N.E.2d 15 (1975), the Illinois Supreme Court acknowledged and approved the following examples contained in the Record of the Proceedings of the Sixth Illinois Constitutional Convention:

1. On October 5, 1982, the Illinois Supreme Court denied a petition for leave to appeal the

" 'Home Rule County adopts an ordinance providing for limits upon rates of interest that may be charged on mortgage and other loans to residents of the county. This ordinance is not valid. The interest-control ordinance is not included in the home-rule powers granted by [section 6(a)] *because of the extensive federal and state regulation of credit institutions.'*

\*       \*       \*       \*       \*       \*

'Home Rule City adopts an ordinance limiting the rates that may be charged by the telephone company for local calls. *Long-standing state regulation of utility rates precludes this subject from being considered a matter pertaining to home-rule government and affairs.'* "

*Id.* 338 N.E.2d at 17 (emphasis added).

The Illinois Appellate Court has also recognized that "where the legislature has adopted a scheme for regulation of a given subject, local legislative control over such phases of the subject as are covered by state regulation ceases." *Hutchcraft Van Serv. v. City of Urbana, Etc.,* 104 Ill.App.3d 817, 60 Ill.Dec. 532, 536, 433 N.E.2d 329, 333 (1982).[1] The *Hutchcraft* court held that "the legislature has preempted the subject of freedom from unlawful discrimination." *Id.* 60 Ill.Dec. at 537, 433 N.E.2d at 334. In so deciding, the court emphasized that it "would be hard-put to envision a more comprehensive statutory scheme than that contained in the Illinois Human Rights Act." *Id.* Similarly, the subject of the prohibition of handgun possession has been impliedly preempted by the Illinois Legislature because one would be "hard-put to envision a more comprehensive statutory scheme than that" set forth in the state statutes on the subject of handgun possession.

The Illinois Legislature, when enacting and amending chapter 38, set forth an extensive scheme, applying to all persons in Illinois, regulating who may possess firearms, when and where they may possess firearms and the types of firearms they may possess. Possession of a handgun or

*Hutchcraft* decision, Illinois Supreme Court Docket No. 56635.

other firearm by a minor, felon, drug addict or mentally ill or retarded person is forbidden by Illinois statute. Ill.Rev.Stat. ch. 38, § 24–3.1.[2] Chapter 38, § 24–1(a)(10) of the Illinois statutes already prohibits possession of a handgun by a person on a public street, alley or public lands[3] and the carrying of a concealed handgun under certain circumstances is proscribed by Ill.Rev.Stat. ch. 38, § 24–1(a)(4).[4] Additionally, it is a violation of state law to possess a firearm in an establishment licensed to sell liquor, wine or beer.[5] Moreover, the legislature has banned the possession of specific types of firearms (i.e., machine guns and sawed-off shotguns) in all circumstances but has refrained from enacting such a categorical prohibition of handgun possession.[6]

As recognized by the majority, consideration was given to the issue of firearm possession at Illinois' Sixth Constitutional Con-

2. Ill.Rev.Stat. ch. 38, § 24–3.1 provides in pertinent part:

"24–3.1. Unlawful possession of firearms and firearm ammunition.

(a) A person commits the offense of unlawful possession of firearms or firearm ammunition when:

(1) He is under 18 years of age and has in his possession any firearm of a size which may be concealed upon the person.

(2) He is under 21 years of age, has been convicted of a misdemeanor other than a traffic offense or adjudged delinquent and has any firearms or firearm ammunition in his possession; or

(3) He has been convicted of a felony under the laws of this or any other jurisdiction within 5 years from release from the penitentiary or within 5 years of conviction if penitentiary sentence has not been imposed, and has any firearms or firearm ammunition in his possession; or

(4) He is a narcotic addict and has any firearms or firearm ammunition in his possession; or

(5) He has been a patient in a mental hospital within the past 5 years and has any firearms or firearm ammunition in his possession; or

(6) He is mentally retarded and has any firearms or firearm ammunition in his possession; or
* * *"

3. Ill.Rev.Stat. ch. 38, § 24–1(a)(10) recites:

"Unlawful Use of Weapons. (a) A person commits the offense of unlawful use of weapons when he knowingly:
*   *   *   *   *   *
(10) Carries or possesses on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his land or in his own abode or fixed place of business, any pistol, revolver, stun gun or taser or other firearm."

4. Ill.Rev.Stat. ch. 38, § 24–1(a)(4) states:

"§ 24–1. Unlawful Use of Weapons. (a) A person commits the offense of unlawful use of weapons when he knowingly:
*   *   *   *   *   *
(4) Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm; or
* * *"

5. Ill.Rev.Stat. ch. 38, § 24–1(a)(8) states:

"§ 24.1. Unlawful Use of Weapons. (a) A person commits the offense of unlawful use of weapons when he knowingly:
*   *   *   *   *   *
(8) Carries or possesses any firearm, stun gun or taser or other deadly weapon in any place which is licensed to sell intoxicating beverages, or at any public gathering held pursuant to a license issued by any governmental body or any public gathering at which an admission is charged, excluding a place where a showing, demonstration or lecture involving the exhibition of unloaded firearms is conducted; or
* * *"

6. Ill.Rev.Stat. ch. 38, § 24–1(a)(7) provides:

"§ 24–1. Unlawful Use of Weapons. (a) A person commits the offense of unlawful use of weapons when he knowingly:
*   *   *   *   *   *
(7) Sells, manufactures, purchases, possesses or carries any weapon from which 8 or more shots or bullets may be discharged by a single function of the firing device, any shotgun having one or more barrels less than 18 inches in length, sometimes called a sawed-off shotgun, or any weapon made from a shotgun whether by alteration, modification or otherwise, if such weapon, as modified or altered, has an overall length of less than 26 inches, or a barrel length of less than 18 inches or any bomb, bombshell, grenade, bottle or other container containing an explosive substance of over one-quarter ounce for like purposes, such as, but not limited to, black powder bombs and Molotov cocktails or artillery projectiles; or
* * *"

vention. It is clear from a review of the transcript of the debates that it was the *state's* police power vis-a-vis firearm possession which was the subject of debate. It was noted that Article I, section 22 of the 1970 Illinois Constitution allows the state legislature considerable discretion in the regulation and prohibition of firearm use and possession. It is pursuant to this authority that the State of Illinois enacted and enforces the extensive provisions of chapter 38. Where the legislature after due deliberation has seen fit to outlaw the possession of handguns it has done so. The statutes discussed above constitute the Illinois Legislature's comprehensive promulgation of mandates concerning the issue of gun possession which: (1) prohibits minors, felons, drug addicts and mentally ill and retarded persons from possessing any firearms; (2) proscribes firearm possession on public streets and alleys and in public places; (3) forbids the carrying of a concealed weapon under certain circumstances; (4) prohibits possession of a firearm in a place licensed to sell alcoholic beverages; (5) prohibits without exclusion the possession of a machine gun or a sawed-off shotgun; and (6) expressly authorizes possession of a handgun within the confines of one's home or fixed place of business.

A locality such as Morton Grove may address a matter of public concern, such as handgun prohibition, only if the Illinois Legislature has not revealed, either expressly or by implication, an intention to occupy the field to the exclusion of all local legislation. The subject of the prohibition of firearm possession has been so extensively and comprehensively addressed in the Illinois Statutes as to impliedly indicate a positive legislative intent to exclusively occupy the field. Therefore, Illinois municipalities are precluded from enacting provisions prohibiting handgun possession.

Further support for the proposition that the Illinois Legislature intended to preemp-

torily address the issue of the prohibition of handguns and firearms is found when comparing Ill.Rev.Stat. ch. 38, § 24 (addressed above) with Ill.Rev.Stat. ch. 38, § 83. Section 24, known as the "Deadly Weapons Act," sets forth the qualifications for the lawful ownership and possession of firearms while section 83 directs owners of firearms to obtain "Firearm Owner's Identification Cards" issued by the Illinois Department of Law Enforcement. Section 83 contains a proviso authorizing municipalities to impose greater *restrictions* or *limitations* on firearm registration and possession than those imposed by the legislature under section 83.[7]

Pursuant to section 83, a municipality can enact an ordinance reasonably restricting or confining the use and possession of firearms. A municipality can also require registration of firearm ownership. What the legislature has authorized is limited regulation of firearm possession by local units of government, but not prohibition. Section 83 does not allow a municipality such as Morton Grove to categorically prohibit handgun possession. To limit or restrict involves a circumscription which falls far short of an absolute prohibition.

> "The words 'prohibit' and 'restrict' are *not synonymous.* They are not alike in their meaning in their ordinary use.... 'To restrict is to restrain within bounds; to limit; to confine and does not mean to destroy or prohibit.' "

*Forest Land Co. v. Black,* 216 S.C. 255, 57 S.E.2d 420, 424 (1950).

If the intention of the Illinois Legislature had been to authorize local prohibition of handgun possession, such intention would have been clearly expressed as was the authorization of local *regulation through restriction and limitation.* As "[r]egulation is inconsistent with prohibition or exclusion," the proviso to section 83 does not minimize the implied intention of the legislature to

---

7. Ill.Rev.Stat. ch. 38, § 83–13.1 recites:
   "Municipal Ordinance Imposing Greater Restrictions or Limitations
   The provisions of any ordinance enacted by any municipality which requires registration

or imposes greater restrictions or limitations on the acquisition, possession and transfer of firearms than are imposed by this Act, are not invalidated or affected by this Act."

exclusively address the issue of handgun possession under section 24. *See Chicago Motor Coach Co. v. City of Chicago,* 337 Ill. 200, 169 N.E. 22, 25 (1929).

The Illinois Legislature, by enacting and amending the extensive provisions of chapter 38, has prohibited certain individuals from possessing firearms, forbidden possession of specific types of firearms and proscribed the possession of firearms in certain places. Despite the Illinois Legislature's refusal to prohibit handgun possession, Morton Grove has seen fit to disregard the legislative intent and has enacted a categorical ban on the possession of handguns, with limited exceptions. In light of long-standing and extensive state control of firearm ownership and possession, Morton Grove Ordinance No. 81–11 impermissibly addresses a subject matter designated by the Illinois Legislature to be the exclusive province of the state legislature.

## II.

The powers of Illinois home rule units are not without limitation. The Illinois Constitution provides that a home rule unit, such as Morton Grove, may "exercise any power and perform any function pertaining to its government and affairs...." Ill. Const. Art. VII, § 6(a). However, any exercise of home rule power by a municipality must be "concurrent" with state legislation in the area. Ill. Const. Art. VII, § 6(i). Morton Grove's Ordinance No. 81–11 is invalid under the Illinois Constitution because the matter of handgun prohibition is not one solely pertaining to local government or local affairs and furthermore, the ordinance is repugnant to and is not concurrent with related state legislation.

Although the powers of home rule units are to be liberally construed, Illinois courts have invalidated ordinances which affected persons and governmental bodies outside the home rule unit. *See Landry v. Smith,* 66 Ill.App.3d 616, 23 Ill.Dec. 636, 639, 384 N.E.2d 430, 433 (1978). Such a limitation

on home rule authority was recognized by the Illinois Supreme Court in the *Ampersand* decision noted above.

"[T]he question is not whether the 'pertaining to ...' language should limit the home rule grant, but rather how extensive the limitation should be.

The local government committee, explaining the intended extent of this limitation, stated in its report to the constitutional convention 'it is clear, however, *that the powers of home rule units relate to their own problems, not to those of the state or the nation.*'"

*Ampersand,* 338 N.E.2d at 17 (emphasis added).

In its *City of Des Plaines v. Chicago & N.W. Ry. Co.,* 65 Ill.2d 1, 2 Ill.Dec. 266, 357 N.E.2d 433 (1976) decision, the Illinois Supreme Court struck down a municipal noise pollution ordinance holding that it was legislation in an area which did not pertain to the government and affairs of the home rule unit. The *City of Des Plaines* court noted that although "noise pollution may initially appear to be a matter of local concern, an analysis of the problem reveals that noise pollution is a matter requiring regional, if not statewide, standards and controls." *Id.* 2 Ill.Dec. at 266, 357 N.E.2d at 433. Of particular import to the *City of Des Plaines* court was "the question of noise emission from trains in transit which may pass through numerous municipalities en route to their destination." *Id.* 2 Ill.Dec. at 268, 357 N.E.2d at 435.

Practical considerations regarding the Morton Grove Ordinance show why handgun possession is properly a matter of statewide concern. Like the ordinance invalidated in *City of Des Plaines,* the Morton Grove Ordinance applies not only to residents of the Village, but also is applicable to non-residents traveling through the Village.[8] The Ordinance is obviously designed to prohibit, with limited exceptions, possession of all handguns in Morton Grove whether by residents, non-residents, travelers, etc.

\*     \*     \*     \*     \*     \*

**8.** Ordinance No. 81–11 § 2(B) recites:
"No person shall possess, in the Village of Morton Grove the following:

(3) Any handgun, unless the same has been rendered permanently inoperative."

Under the Morton Grove Ordinance, a handgun owner must either take a circuitous route around the Village of Morton Grove or make arrangements to surrender his handgun to the police upon entering the Village and reacquire possession when he leaves.[9] Not only does this infringe upon the citizen's right to travel and, arguably, interfere with interstate commerce but it lends credence to the distinct possibility that gun control in Illinois will be no more than a crazy quilt of conflicting and unenforceable home rule ordinances. In this respect, it is important to remember that "a concomitant effect of this unenforceability is an erosive disrespect for the law which should not be tolerated."[10] Experience has taught mankind that the retention of unenforceable laws which are regularly violated breeds contempt for the law in general. Citizens must not be permitted to pick and choose which laws they wish to obey.

The majority opinion fails to recognize that the subject of handgun possession poses problems that transcend municipal boundaries and is thus not a local affair within the meaning of the Illinois Constitution. The majority flatly and cavalierly states that Illinois has "no overriding state interest in gun control which requires it to retain exclusive control in order to prevent home rule units from adopting conflicting enactments." To support this proposition, the majority relies without discussion on *City of Evanston v. Create, Inc.,* 85 Ill.2d 101, 51 Ill.Dec. 688, 421 N.E.2d 196 (1981).

The *Create* decision, however, is inapposite to the instant case. In *Create,* the Illinois Supreme Court held that an Evanston landlord-tenant ordinance was a valid exercise of Evanston's home rule powers granted by the Illinois Constitution. Landlord-tenant ordinances are, by their very nature, matters of local concern since, like zoning ordinances, they apply exclusively to local residents and landowners. Such ordinances are enacted to be specifically suited

to the unique needs of a locality's residents. The local governing body involved is keenly and uniquely aware of the needs of the community it serves. The landlord-tenant ordinance in *Create* had no impact on temporary or transitory visitors to Evanston. On the other hand, the Morton Grove handgun ordinance has a far broader scope in that it effects not only Morton Grove residents but also those citizens who merely pass through the Village.

That the prohibition of handgun possession is properly a matter of state concern can be further illustrated as follows: consider the political and administrative difficulties which would arise if Home-Rule Unit A were to pass an ordinance banning the possession of all handguns and Home-Rule Unit B were to pass an ordinance making handgun possession mandatory. What is outlawed in one municipality becomes mandatory in another. The Illinois Legislature never intended to permit the possibility of a hodgepodge of conflicting home rule enactments when it adopted Ill. Rev.Stat. ch. 38 to address the statewide issue of the prohibition of handgun ownership.

An analogy between the subject of gun control and the field of children's health care further highlights the propriety of statewide uniformity and enforcement. Due to difficulties in enforcement and the need for statewide uniformity, many states have passed legislation requiring the immunization of school age children against contagious diseases. *See, e.g.,* Ill.Rev.Stat. ch. 111½, §§ 22.11 and 22.12. If local authorities were allowed to pass conflicting ordinances regarding the vaccination of school age children, the enforcement of these ordinances in multi-municipal school districts would be extremely difficult, if not impossible.

The Illinois Legislature has not enacted a categorical prohibition of handgun posses-

---

**9.** Illinois law permits a handgun owner to transport a handgun by car if the handgun is not immediately accessible to the driver or any other occupant of the vehicle. *See* Ill.Rev.Stat. ch. 38, §§ 24–1(a)(4) and 24(2)(b)(4).

**10.** *Peoples v. Abrahams,* 40 N.Y.2d 277, 286, 386 N.Y.S.2d 661, 353 N.E.2d 574 (1976).

sion, even though it was the view of the framers of the Illinois Constitution that firearm possession was a matter of state-wide concern and that the state legislature had the power to ban handgun possession, if it so desired. In the debates at the Sixth Illinois Constitutional Convention which adopted the present Illinois Constitution, Delegate Foster, speaking for the majority explained:

> "We feel that ... the state would have the right to prohibit some classes of fire-arms, such as war weapons, handguns, or some other category.
>
>   *    *    *    *    *    *
>
> [I]t is the position of the majority that under the police power of the state, the legislature would have the authority, for example, to forbid all handguns ... [and] it is still the position of the majority that short of an absolute and complete ban on the possession of all firearms, this provi-sion would leave the legislature free to regulate the use of firearms in Illinois."

3 Proceedings of Sixth Illinois Constitution-al Convention at 1688, 1818 and 1718.

Delegate Foster's comments demonstrate that it was recognized by the Convention that firearm possession is a matter of state concern. Despite the clear meaning of Fos-ter's words, the majority in the instant case concludes, based on the Delegate's remarks, that the framers of the Illinois Constitution "envisioned that *local governments* might exercise their police power to restrict, or prohibit, the right to keep and bear arms." (emphasis added). The fallacy of the ma-jority's logic is obvious; Delegate Foster said that "the *state* would have the right to prohibit ... handguns" and "that under the police power of the *state, the legislature* would have the authority, for example, to forbid all handguns...." (emphasis add-ed). In fact, Foster's remarks directly con-tradict, rather than support, the majority's conclusion that a local municipality such as Morton Grove may prohibit handgun pos-session; clearly, Foster's view was that handgun possession was a matter of state-wide concern best addressed by state legis-lation.

The Morton Grove Ordinance prohibiting handgun possession is invalid because it does not act concurrently with the Illinois Legislature's extensive regulation of fire-arm registration and possession. Black's Law Dictionary defines "concurrent" as "united in agreement." BLACK'S LAW DIC-TIONARY 263 (5th Ed. 1979). Morton Grove's prohibition of handgun possession is not "united in agreement" with the state statu-tory scheme but is fundamentally at odds with the extensive state regulation of hand-gun possession. The state legislation is reg-ulatory while Morton Grove's enactment is prohibitory.

The state legislature and the Morton Grove Ordinance approach the subject of gun control from opposite directions. The legislature started from the point that all persons may possess handguns and then proceeded to regulate and restrict specific types of guns, rather than banning hand-guns and then authorizing certain persons or classes to possess them. This reveals an implied intent to extend to all citizens a privilege to possess handguns except where, by operation of *state law,* that privilege is circumscribed in the interests of the com-mon good. Morton Grove, in contrast, takes the opposite approach by prohibiting all handguns and then grants permission to possess handguns to limited classes of per-sons. Thus, the Morton Grove Ordinance is invalid as it is fundamentally at odds with the legislature's will to allow Illinois citi-zens to possess handguns, except in very limited circumstances, because "the test of concurrent authority ... is the absence of conflict with the legislative will." *Mary-land & D.C. Rifle & Pistol Ass'n., Inc. v. Washington,* 442 F.2d 123, 130 (D.C.Cir. 1971).

The second reason Morton Grove's Ordi-nance does not operate concurrently with state law is even more significant. The ordinance is invalid to the extent that it prohibits what is expressly permitted by state statute. "To be sure, a municipal regulation cannot permit an act which the statute forbids, or forbid an act which the statute permits." *Id.*

A number of sections of chapter 38 of the Illinois Statutes contain exceptions to the general provisions which ban the possession of handguns under certain circumstances. Of particular significance are those statutory sections which expressly allow for the possession of handguns by individuals when in their homes, in their fixed places of business or upon their land.[11] The Illinois Legislature has expressly authorized the citizens of Illinois to carry handguns while present in certain locations. Such authorization is directly nullified by Morton Grove Ordinance No. 81–11.

A municipal ordinance providing for the registration of firearms was attacked in *Brown v. City of Chicago,* 42 Ill.2d 501, 250 N.E.2d 129 (1969). Although the Illinois Supreme Court noted that the legislature had not preempted the registration aspect of the subject of gun control, the court did note that the ordinance would be struck down if it contradicted the provisions of the statute. The registration ordinance was upheld because there was "no inconsistency or repugnancy" between it and statutory provisions relating to firearm ownership registration. *Id.* at 250 N.E.2d 129. There can be no doubt as to the repugnancy of Morton Grove Ordinance No. 81–11 as it directly contradicts an authorization recited in the state statutes. Additionally, the ordinance is inconsistent with the state regulatory scheme as prohibition is inconsistent with regulation. I would find no problem with Morton Grove requiring handgun registration similar to that involved in *Brown.* Registration and prohibition, by their very nature, seek to achieve different goals. Regulation through registration allows possession subject to reasonable limits while prohibition mandates an outright ban on possession.

As Morton Grove has impermissibly acted under its home rule powers vis-a-vis Ordinance No. 81–11, it is the obligation of this court to strike down the municipal enactment. Clearly, the creation of a *uniform* regulatory scheme concerning the possession of handguns is a matter of statewide, or even federal concern, which should not be disrupted by permitting this type of contradictory local action.

### III.

I find today's decision particularly disturbing as it sanctions governmental action which I feel impermissibly interferes with basic human freedoms. I cannot let this opportunity pass without expressing my concern with the erosion of these rights.

The majority cavalierly dismisses the argument that the right to possess commonly owned arms for self-defense and the protection of loved ones is a fundamental right protected by the Constitution. Justice Cardozo in *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 151, 82 L.Ed. 288 (1937), defined fundamental rights as those rights "implicit in the concept of ordered liberty." Surely nothing could be more fundamental to the "concept of *ordered* liberty" than the basic right of an individual, within the confines of the criminal law, to protect his home and family from unlawful and dangerous intrusions.

Article I, section 22 of the Illinois Constitution provides that subject to the "police power," the right of an individual to bear arms shall not be infringed. The United States Supreme Court has noted the difficulty in attempting to outline the parameters of a state's legitimate police power. In *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), addressing the concept of "police power," the Supreme Court stated that "an attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts." *Id.* at 33, 75 S.Ct. at 102. The term is neither "abstractly nor historically capable of complete definition." *Id.* In enacting Ordinance No. 81–11, Morton Grove has gone beyond the "outer limits" of its legitimate police powers.

In *Haller Sign Works v. Physical Culture Training School,* 249 Ill. 436, 94 N.E. 920 (1911), the Illinois Supreme Court recognized that it is the responsibility of the

---

11. *See, e.g.,* Ill.Rev.Stat. ch. 38, §§ 24–1(a)(4),     (10).

courts to determine when constitutional limits have been exceeded in the enactment of police power legislation. It is the duty of the courts to determine whether there has been an "unreasonable invasion of private rights." *Id.* 94 N.E. at 922.

"Necessarily there are limits beyond which legislation cannot constitutionally go in depriving individuals of their natural rights and liberties. To determine where the rights of the individual end and those of the public begin is a question which must be determined by the court."

*Id.* 94 N.E. at 927.

In today's decision this court has refused to take cognizance of the natural right of an individual, within the confines of the criminal law, to protect his home and family from unlawful and dangerous intrusions. It is my opinion that Morton Grove Ordinance No. 81–11 impermissibly interferes with the rights of Illinois citizens to guard their personal security, subject to the limits of the criminal law, and that it is the duty of this court to so declare.

The court today has also refused to recognize the tremendous impact of Morton Grove Ordinance No. 81–11 on personal privacy rights. There is no doubt that the right to one's privacy is afforded constitutional protection. The United States Supreme Court has repeatedly recognized a right to privacy implicit in the federal constitution and Article I, section 6, of the Illinois Constitution expressly establishes a right to privacy. The Illinois provision has been interpreted by some members of the Illinois Supreme Court as creating a direct right to freedom from invasions of privacy by government or public officials. *See Stein v. Howlett,* 52 Ill.2d 570, 289 N.E.2d 409, 411, *appeal dismissed,* 412 U.S. 925, 93 S.Ct. 2750, 37 L.Ed.2d 152 (1973).

The Morton Grove Ordinance, by prohibiting the possession of a handgun within the confines of the home, violates both the fundamental right to privacy and the fundamental right to defend the home against unlawful intrusion within the parameters of the criminal law. There is no area of human activity more protected by the right to privacy than the right to be free from unnecessary government intrusion in the confines of the home.

The unique importance of the home from time immemorial has been amply demonstrated in our constitutional jurisprudence. Among the enumerated rights in the Bill of Rights are the Third Amendment's prohibition of quartering of troops in a private house in peace-time and the right of citizens to be "secure in their ... houses ... against unreasonable searches and seizures ..." guaranteed by the Fourth Amendment. As early as 1886, the United States Supreme Court recognized that the Fifth Amendment protects against all governmental invasions "of the sanctity of a man's home and the privacies of life." *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The First Amendment had been held to encompass the right to "privacy and freedom of association in the home." *Moreno v. United States Dep't of Agriculture,* 345 F.Supp. 310, 314 (D.D.C. 1972), *aff'd,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

In *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Supreme Court overturned a state conviction for possession of obscene material, holding "that the First and Fourteenth Amendments prohibit making the private possession of obscene material a crime." The Supreme Court had previously held that obscenity is not protected by the First Amendment, but in *Stanley* the Court made a distinction between commercial distribution of obscene matter and the private possession of such materials in the home and held the Georgia statute unconstitutional because it prohibited the possession of such materials in the home. The Court recited:

"For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy."

*Id.* at 564, 89 S.Ct. at 1247.[12]

The Court has made it clear that its *Stanley* decision was not based on the idea that

**12.** I am aware of Justice Marshall's comments contained in footnote No. 11 of the *Stanley*

obscene matter is itself protected under the right of privacy. Rather, the focus in *Stanley* was on the fact that the activity prohibited by the Georgia statute occurred in the privacy of the home. In *United States v. Reidel,* 402 U.S. 351, 356, 91 S.Ct. 1410, 1412, 28 L.Ed.2d 813 (1971), the Court rejected the argument that commercial distribution of pornography is constitutionally protected and held that the "focus" of *Stanley* was "on freedom of mind and thought and on the privacy of one's home." Subsequently, the Court in *United States v. Orito,* 413 U.S. 139, 142, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513 (1973) stated "the Constitution extends special safeguards to the privacy of the home" and there exists a "myriad" of activities which may be prohibited in public but which may be lawfully conducted within the privacy and confines of the home.

Most importantly, the Supreme Court in *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 66, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973), held that *Stanley* was decided "on the narrow basis of the 'privacy of the home' which was hardly more than a reaffirmation that '*a man's home is his castle.*' " (emphasis added).

Privacy in the home is a fundamental right under both the federal and Illinois Constitutions. This does not mean, of course, that a person may do anything at anytime as long as the activity takes place within a person's home. Instead, the right to privacy is limited in two important respects. First, the Supreme Court strictly limited its *Stanley* holding to possession for purely private, noncommercial use in the home. Second, as noted in *Stanley,* the right to privacy must yield when it seriously interferes with the public welfare. The government bears a heavy burden when attempting to justify an expansion, as in gun control, of the "limited circumstances" in which intrusion into the privacy of a home is permitted.

Morton Grove has not met that heavy burden. Without question, the state may, should and has placed reasonable restrictions on the possession of handguns outside one's home to protect the public welfare. However, Morton Grove's prohibition of handgun possession within the confines of a person's own home has not been shown to be necessary to protect the public welfare and thus violates the fundamental right to privacy.

The right to privacy is one of the most cherished rights an American citizen has; the right to privacy sets America apart from totalitarian states in which the interests of the state prevail over individual rights. A fundamental part of our concept of ordered liberty is the right to protect one's home and family against dangerous intrusions subject to the criminal law. Morton Grove, acting like the omniscient and paternalistic "Big Brother" in George Orwell's novel, "1984", cannot, in the name of public welfare, dictate to its residents that they may not possess a handgun in the privacy of their home. To so prohibit the possession of handguns in the privacy of the home prevents a person from protecting his home and family, endangers law-abiding citizens and renders meaningless the Supreme Court's teaching that "a man's home is his castle."

## IV.

In summary, I believe a truly independent judiciary must exercise its powers with discretion and reservation, giving due deference to the other branches of government. Our judicial responsibility, however, obligates us to declare an act by another governmental unit to be void if we believe the enacted law is contrary to the principles of the Constitution. Because I believe that the Morton Grove Ordinance as enacted is contrary to the principles of the ·Constitution, I must respectfully dissent from the opinion of this court.

decision. I believe however, as noted herein, that subsequent decisions of the Court have divested the footnote of any significance vis-a-vis this court's review of Morton Grove Ordinance No. 81–11.